## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RICHARD G. PESTELL, M.D., PH.D.,

      Plaintiff,

  v.

CYTODYN INC.; CYTODYN OPERATIONS
INC.; NADER Z. POURHASSAN, PH.D.;
AND SCOTT A. KELLY, M.D.,

      Defendants.

Civil Action No. 1:19-cv-01563-RGA

## FIRST AMENDED COMPLAINT

Plaintiff Richard G. Pestell, M.D., Ph.D. ("Plaintiff" or "Dr. Pestell"), by and through his

undersigned counsel, hereby files this First Amended Complaint against Defendants CytoDyn

Inc., CytoDyn Operations Inc.,[1] Nader Z. Pourhassan, Ph.D. (the "CEO"), and Scott A. Kelly,

M.D. (the "Chairman") and in support thereof alleges as follows:

## INTRODUCTION

1.      In 2018, CytoDyn, a publicly-traded biotechnology company based in

Washington, acquired substantially all of the assets of ProstaGene, LLC ("ProstaGene"), a

privately held biotechnology start-up founded in 2011 by Dr. Pestell and based in the

Philadelphia area.  As part of the transaction, Dr. Pestell joined CytoDyn as a member of its

Board of Directors (the "Board") and as its Chief Medical Officer ("CMO") pursuant to the

terms of an Employment Agreement (the "Employment Agreement") dated November 16, 2018.

2.      In recent months, however, the relationship between Dr. Pestell and the Company

has deteriorated.  In retaliation for objections raised by Dr. Pestell regarding an FDA submission

---

[1]      Defendants CytoDyn Inc. and CytoDyn Operations Inc. are referred to collectively herein
as "CytoDyn" or the "Company."

in June 2019, the Company, often acting through the CEO, inhibited and obstructed Dr. Pestell's performance of his duties as CMO at every turn, including by: (1) failing to support or fund key programs under his authority, including the Company's oncology laboratory; (2) prohibiting him from communicating with employees and others with whom he needed to interact to properly execute his duties; (3) excluding him from important decisions and meetings regarding matters within his purview as CMO; and (4) supplanting his role with the hiring of a "Chief Science Officer."

3.      Because these actions diminished his authority and constituted material breaches of the Employment Agreement, Dr. Pestell notified the Company by letter that Good Reason existed for his resignation.  The letter described in detail the conduct and conditions constituting Good Reason and provided a 35-day period for cure.

4.      The Company responded by firing Dr. Pestell three days later.  As a pretext for its retaliatory firing of Dr. Pestell, the Company asserted the existence of "Cause" (which is narrowly defined in the Employment Agreement), but notably failed to offer any explanation for that assertion – nor could they, as Cause did not exist.  Nonetheless, the following day, the Company announced to the public that Dr. Pestell had been terminated "for cause."

5.       Among other relief set forth below, Dr. Pestell seeks to recover what he is owed under the Employment Agreement, including severance, and under the Pennsylvania Wage Payment and Collection Law (the "WPCL").  Dr. Pestell also seeks damages for the harm he has suffered as a result of the Company's defamatory statements regarding his termination.

## PARTIES

6.      Plaintiff Dr. Pestell is an individual residing at 2845 NE 9th Street, Apt. 604, Fort Lauderdale, Florida 33304.   From November 16, 2018 to July 25, 2019, Dr. Pestell was CytoDyn's Chief Medical Officer, a director, and Vice Chairman of the Board.   Upon information and belief, Dr. Pestell is also CytoDyn's largest shareholder.

7.      Defendant CytoDyn Inc. is a Delaware corporation with its principal place of business located at 1111 Main Street, Suite 660, Vancouver, Washington 98660.

8.      Defendant CytoDyn Operations Inc. is a Delaware corporation with its principal place of business located at 1111 Main Street, Suite 660, Vancouver, Washington 98660. CytoDyn Operations Inc. is a wholly owned subsidiary of CytoDyn Inc.

9.      Defendant Nader Z. Pourhassan, Ph.D. is an individual with a place of business at 1111 Main Street, Suite 660, Vancouver, Washington 98660.   Dr. Pourhassan is (and was at all times material hereto) the President and Chief Executive Officer of CytoDyn, as well as a member of the Board.

10.     Defendant Scott A. Kelly, M.D. is an individual with a place of business at Resurgens Orthopaedics, 665 South 6th Street, Griffin, GA 30224.   At all times material hereto, Dr. Kelly has been a member of the Board of CytoDyn.   In December 2018, he was named Chairman of the Board.   On July 15, 2019, Dr. Kelly was named as CytoDyn's Chief Science Officer.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Dr. Pestell is a citizen of the State of Florida, where he has been domiciled since March 2019.   Prior to March 2019, Dr. Pestell was domiciled in and a citizen of the Commonwealth of Pennsylvania.

13.     Defendants CytoDyn Inc. and CytoDyn Operations Inc. are citizens of the State of Delaware, where they are incorporated, and of the State of Washington, where they have their principal place of business.

14.     Defendant Dr. Pourhassan is, upon information and belief, a citizen of the State of Washington.

15.     Defendant Dr. Kelly is, upon information and belief, a citizen of the State of Georgia.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants CytoDyn Inc. and CytoDyn Operations Inc. are citizens of this District.

17.     Additionally, Dr. Pestell and the Company agreed in Section 5.6 of the Employment Agreement that "[a]ny and all actions arising out of th[e] [Employment] Agreement or [Dr. Pestell's] employment by Company or termination therefrom shall be brought and heard in the state and federal courts of the State of Delaware and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of any such courts."

18.     Pursuant to 10 Del. C. § 3114, Dr. Pourhassan is a proper party over whom the Court may exercise personal jurisdiction because: (i) he purposefully availed himself of the benefits and protections of Delaware law and consented to personal jurisdiction in Delaware by

{00209306}                                        4

accepting and holding a position as an officer and a director of a Delaware corporation, in which capacity(ies) he took the actions complained of herein; (ii) he has a tangible legal interest in the dispute that is separate from the Company's, because he may be held personally liable as the Company's agent and/or officer under the WPCL; and (iii) Dr. Pestell's claims against him arise out of the same facts and occurrences as the claims against CytoDyn.

19.     Pursuant to 10 Del. C. § 3114, Dr. Kelly is a proper party over whom the Court may exercise personal jurisdiction because: (i) he purposefully availed himself of the benefits and protections of Delaware law and consented to personal jurisdiction in Delaware by accepting and holding a position as a director of a Delaware corporation, in which capacity he took the actions complained of herein; (ii) he has a tangible legal interest in the dispute that is separate from the Company's, because he may be held personally liable as the Company's agent under the WPCL; and (iii) Dr. Pestell's claims against him arise out of the same facts and occurrences as the claims against CytoDyn.

20.     Because the Employment Agreement contains a Delaware forum selection clause and because the CEO and the Chairman were acting in their official capacities on behalf of a Delaware corporation, it was foreseeable that they would be subject to litigation in Delaware relating to their conduct in connection with the termination of Dr. Pestell's employment, and they could anticipate being required to defend themselves before this Court.

**FACTS**

*The ProstaGene Acquisition*

21.     Dr. Pestell, AO, M.D., Ph.D., MBA, FRACP, FACP, is a world-renowned physician-scientist, who has spent over 37 years developing his reputation in the fields of Medical Oncology and Endocrinology.  Originally from Perth, Australia, Dr. Pestell received his M.B.B.S. degree from the University of Western Australia and his Ph.D. and M.D. from the University of Melbourne, and completed postdoctoral clinical and research fellowships at Massachusetts General Hospital and Harvard Medical School.  Dr. Pestell later completed his executive MBA from the Stern School of Business at New York University.

22.     Dr. Pestell's professional background includes serving as Director of the Sidney Kimmel Cancer Center at Thomas Jefferson University from 2005 to 2015, as well as Executive Vice President of Thomas Jefferson University, which, with its hospitals, employs more than 30,000 people and has a $5.6 billion annual budget.  Prior to 2005, Dr. Pestell served as Chairman of the Department of Oncology at Georgetown University Medical Center and Director of the Lombardi Comprehensive Cancer Center at Georgetown University.

23.     Dr. Pestell has served on domestic and international advisory boards, including the boards of seven National Cancer Institute Cancer Centers.  He has served as an advisor for 18 international agencies on topics of research and research funding.  In 2009, he was invited to provide expert testimony before the U.S. Senate, Committee on Appropriations, Subcommittee on Departments of Labor, Health and Human Services, Education, and Related Agencies, on the topics of cancer and cancer research.

24.     Dr. Pestell has authored more than 600 publications, which have been cited more than 61,000 times.  His published work includes 26 book chapters and 208 published abstracts, as well as serving as the editor of a book concerning prostate cancer.  Dr. Pestell is among the

most-cited researchers in the world in his fields of expertise – indeed, on Google Scholar, he is ranked number one in the world in the fields of cell-cycle and prostate cancer, and number ten in the world for oncology.  He has also given more than 270 invited lectures, including numerous lectures for which he was keynote or plenary speaker.

25.    Dr. Pestell has been a reviewer for 26 different academic journals, and has been a member of the editorial board of 14 journals.  He has been a reviewer for the National Institutes of Health since 1998, and served as a reviewer of NCI-designated cancer centers since 2004.  He has also been a reviewer for more than 18 funding agencies in 9 countries.

26.    Dr. Pestell has been elected or made a member of numerous highly reputable organizations, including, among others: Royal Society of Medicine (UK); New York Academy of Sciences; American College of Physicians; Knowledge Nation 100; National Medical Association; World Affairs Council of Philadelphia; American Society for Investigative Pathology; American Australian Association; Royal Australian College of Physicians, Research and Education Foundation; American Association for Cancer Research, Finance Committee; Advance – Australian Professionals in America; American Society of Clinical Oncology; Association of American Cancer Institutes; American Society for Clinical Investigation; American Society for Microbiology; American Association for Cancer Research; American Society for Biochemistry and Molecular Biology; Endocrine Society of the USA; Australian Association of Consultant Physicians; and Endocrine Society of Australia.

27.    Dr. Pestell has been the recipient of more than 30 national and international awards and recognitions, which include, *inter alia*: the Winthrop Fellowship from The Royal Australian College of Physicians; Doctor *honoris causa* from the University of Western Australia; Fellowship in the American College of Physicians; Fellowship in the American

Association for the Advancement of Science; the Eric Susman Prize in Medicine from the Royal Australasian College of Physicians; and Doctor of Medical Sciences *honoris causa* from the University of Melbourne.

28.     Most recently, on June 10, 2019, Dr. Pestell was appointed an Officer of the Order of Australia (AO) in the 2019 Queen's Birthday Honours List, in recognition of his "distinguished service to medicine, and to medical education, as a researcher and physician in the fields of endocrinology and oncology."

29.     Dr. Pestell has also authored multiple issued patents and founded two biotechnology companies.

30.     In 2011, Dr. Pestell founded ProstaGene, a biotechnology start-up company focused on developing gene-based prostate cancer testing technology and metastasis prevention and treatment technology.  The metastasis control technology is based on blocking the "CCR5" receptor.

31.     The CCR5 receptor is a protein located on the surface of a variety of cells including white blood cells and cancer cells.  On white blood cells, it serves as a receptor for chemical attractants called chemokines.  CCR5 also acts as a co-receptor that facilitates entry of HIV into a cell.  Recent research has also indicated that CCR5 plays a role in cancer metastasis and certain immunological conditions.

32.     Dr. Pestell held a 77.241% membership interest in ProstaGene, and also owned certain intellectual property interests that were licensed to ProstaGene.

33.     CytoDyn is a biotechnology company focused on the clinical development of Leronlimab (also known as PRO 140), a humanized monoclonal antibody which targets the CCR5 receptor, for the treatment and prevention of HIV infection and, more recently, cancer and

inflammatory diseases.  For HIV, Leronlimab works by preventing HIV from using the CCR5 receptor as an entry gateway to healthy cells.  For cancer, preclinical research has shown that Leronlimab blocks calcium channel signaling of the CCR5 receptor when present on the cancer cell surface, which is a crucial component to the spread of metastatic cancer.

34.     In July 2018, CytoDyn decided to strategically expand its clinical focus (which to that point had been focused primarily on HIV) to include certain cancers and immunological conditions, in connection with which it signed a non-binding letter of intent to acquire substantially all of the assets of ProstaGene.

35.     On August 27, 2018, CytoDyn Inc., Point NewCo, Inc. (a Delaware corporation and wholly owned subsidiary of CytoDyn), Point Merger Corp. (a Delaware corporation and wholly owned subsidiary of Point NewCo, Inc.), ProstaGene (a Delaware limited liability company), and Dr. Pestell entered into a Transaction Agreement, pursuant to which CytoDyn agreed to purchase substantially all of the assets and rights, and to assume certain obligations and liabilities, associated with ProstaGene's business (the "ProstaGene Acquisition").

36.     The Transaction Agreement also provides that, as a condition to closing on the ProstaGene Acquisition, the Company would employ Dr. Pestell as its CMO (pursuant to the terms of the Employment Agreement) and appoint him to the Company's Board of Directors.

37.     The Transaction Agreement provides that it shall be governed by Delaware law.

38.     Although Chief Financial Officer Michael Mulholland (the "CFO") signed the Transaction Agreement on behalf of the Company, the signature pages to the Transaction Agreement include signature blocks for Defendant Pourhassan, demonstrating that the parties at some point expected him to sign the agreement on behalf of the Company.

39.     Closing on the ProstaGene Acquisition (the "Closing") occurred on November 16, 2018.

40.     As consideration for ProstaGene's assets (which consisted primarily of intellectual property and intellectual property rights), CytoDyn issued 27,000,000 common shares (the "Acquisition Shares") to ProstaGene.

41.     Pursuant to an Escrow Agreement dated November 16, 2018 between CytoDyn, ProstaGene, and escrow agent Computershare Trust Company, N.A., 5,400,000 of the Acquisition Shares were held in escrow as CytoDyn's sole source of recovery if any indemnification claims arose.  Of the 5,400,000 shares subject to the Escrow Agreement, Dr. Pestell held a beneficial interest (due to his membership interest in ProstaGene) in 4,171,013 of them.

42.     The Escrow Agreement provides that the escrowed shares will be released in 3 equal installments at 6, 12, and 18 months after the Closing.  The first release occurred on May 23, 2019, on which date CytoDyn authorized the release of 1,800,000 shares from escrow. ProstaGene subsequently distributed such shares to its members, with Dr. Pestell receiving 1,103,843 shares.

43.     In connection with the ProstaGene Acquisition, 8,342,000 of the Acquisition Shares were distributed directly to Dr. Pestell and made subject to a Stock Restriction Agreement (the "Stock Restriction Agreement") entered into between CytoDyn, ProstaGene, and Dr. Pestell on November 16, 2018.[2]  The Stock Restriction Agreement restricts the transfer of the Restricted Stock for a three-year period, and provides that, if Dr. Pestell's employment with the Company is terminated other than by the Company without Cause or by Dr. Pestell for Good Reason, the

---

[2]     The 8,342,000 shares subject to the Stock Restriction Agreement are referred to herein as the "Restricted Stock."

Company has a "Repurchase Option" to repurchase the Restricted Stock at a purchase price of $0.001 per share. The Restricted Stock vests and is released from the Stock Restriction Agreement in three equal annual installments commencing one year after the Closing of the ProstaGene Acquisition. A true and correct copy of the Stock Restriction Agreement is attached hereto as <u>Exhibit B</u>.

44.     Section 4 of the Stock Restriction Agreement provides: "As soon as reasonably practicable after [November 16, 2018], the Company shall issue a stock certificate in the Stockholder's name that corresponds to the Restricted Stock . . . and shall hold such Certificate in escrow for the Stockholder's benefit, properly endorsed for transfer, until such time as the Restricted Stock are forfeited to the Company or all restrictions thereon lapse."

45.     The Stock Restriction Agreement provides that it, and matters arising therefrom, shall be governed by and construed in accordance with Delaware law.

46.     Of the 13,258,000 Acquisition Shares *not* subject to the Escrow Agreement or Stock Restriction Agreement, Dr. Pestell holds an actual or beneficial interest in 8,339,697 of them due to his membership interest in ProstaGene.

47.     Thus, in summary, Dr. Pestell holds an actual or beneficial interest in: (i) 8,342,000 shares subject to the Stock Restriction Agreement; (ii) 4,171,013 shares subject to the Escrow Agreement (of which 1,103,843 have been distributed to Dr. Pestell to date); and (iii) 8,339,697 additional shares.

48.     During the time between the signing of the Transaction Agreement in August 2018 until the Closing, Dr. Pestell served as the Company's interim CMO. Upon the Closing, the parties executed the Employment Agreement and Dr. Pestell became the CMO on a permanent basis.

49.     Dr. Pestell was also appointed to the Board, as of the Closing date.

50.     In connection with his employment as CMO, Dr. Pestell was also granted a stock option to purchase up to 350,000 additional shares of common stock, which would vest and become exercisable in three equal annual installments starting on November 16, 2019.

51.     Dr. Pestell also entered into a Confidential Information, Inventions and Noncompetition Agreement (the "Covenants Agreement") dated November 16, 2018, which includes a noncompetition covenant for the later of five (5) years after the Closing or one (1) year after Dr. Pestell's termination for any reason.

*The Employment Agreement*

52.     The Employment Agreement was entered into on November 16, 2018 between the Company and Dr. Pestell (referred to therein as the "Executive"), and set forth the terms and conditions of Dr. Pestell's employment relationship with the Company.  A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.

53.     CFO Michael Mulholland signed the Employment Agreement on behalf of the Company.  However, the signature pages to the Employment Agreement include a signature block for Defendant Pourhassan, demonstrating that the parties at some point expected him to sign the agreement on behalf of the Company.  The draft Indemnification Agreement attached to the Employment Agreement as Schedule B likewise includes a signature block for Defendant Pourhassan.

54.     Section 2.2 of the Employment Agreement set forth the scope of Dr. Pestell's duties and responsibilities as CMO:

> Subject to the direction and authority of the Board of Directors of the Company (the "Board"), the Executive shall have direct responsibility for providing direction and leadership for the Company's pipeline and development programs in oncology and immunology for PRO 140.  The

Executive will be actively engaged in assisting to define the overall business strategy and direction for the Company's clinical development plans, including strategic development and implementation of clinical programs, collaboration with strategic partners and further exploration of new and existing patent protection for PRO 140 in oncology and immunology. The Executive will also have oversight responsibilities for the Company's Scientific Advisory Board. The Executive shall report to, and be subject to the lawful direction of, the Board and the Chief Executive Officer of the Company (the "CEO"). The Executive agrees to perform to the best of his ability, experience, and talent those acts and duties, consistent with the position of Chief Medical Officer, as the CEO shall from time to time reasonably direct.

55.     Section 1.2 of the Employment Agreement provided for a three (3) year term (referred to as the "Basic Term") for Dr. Pestell's employment with the Company, commencing on November 16, 2018.

56.     Pursuant to Section 3.1 of the Employment Agreement, Dr. Pestell's initial "Base Salary" was $400,000 per year, subject to periodic adjustments as the Board and/or the Board's compensation committee (the "Compensation Committee") deemed appropriate.

57.     On February 16, 2019, the Compensation Committee approved an increase of Dr. Pestell's annual Base Salary to $600,000.

58.     During his employment, Dr. Pestell was also eligible to receive, as set forth in Section 3.1 of the Employment Agreement: (i) an "Annual Bonus," which had "a target amount equal to fifty percent (50%) of the Base Salary" and would be "based upon the level of achievement of the Company's corporate objectives and the Executive's individual objectives," as determined by the Board and/or the Compensation Committee; and (ii) a "Supplemental Bonus," the award and amount of which would "be determined by the Board in its sole discretion."

59.     The provisions governing termination of Dr. Pestell's employment with the Company are set forth in Article 4 of the Employment Agreement.

60.     Section 4.1 of the Employment Agreement is entitled "Termination Without Cause; Resignation for Good Reason."  Section 4.1(a) provides:

> The Company may terminate the Executive's employment hereunder at any time without Cause (other than by reason of death or Disability) upon written notice to the Executive.  The Executive may resign for Good Reason provided he notifies the Company within ninety (90) days of the occurrence of any of the conditions that he reasonable [sic] considers to be a "Good Reason" condition and provides the Company with at least thirty (30) days in which to cure the condition; provided that if the Executive fails to provide this notice and cure period to his resignation, or resigns more than six (6) months after the initial existence of the condition, his resignation will not be deemed to be for "Good Reason".

61.     "Cause" is defined in Section 4.1(b) of the Employment Agreement as:

> (i) a material act, or act of fraud, committed by the Executive that is intended to result in the Executive's personal enrichment to the detriment or at the expense of the Company or any of its Affiliates; (ii) the Executive is convicted of a felony; (iii) willful and continued failure by the Executive to perform the duties or obligations reasonably assigned to the Executive by the Board from time to time, which failure is not cured upon ten (10) days prior written notice (unless such failure is not susceptible to cure, as determined in the sole judgment and discretion of the Board); or (iv) the Executive materially violates the Covenants Agreement (as defined [in the Employment Agreement]).

62.     Section 4.1(b) of the Employment Agreement defines "Good Reason" as:

> [T]he occurrence of any of the following without the Executive's consent: (1) a material breach by the Company of the terms of th[e] [Employment] Agreement; (2) a reduction in the Executive's Base Salary; (3) a material diminution in the Executive's authority, duties or responsibilities; or (4) a relocation by the Company of the Executive's principal place of business for the performance of his duties under th[e] [Employment] Agreement to a location that is anywhere outside of a 30 mile radius of Wynnewood, Pennsylvania.

63.     Pursuant to Section 4.1(c) of the Employment Agreement, if the Company terminates Dr. Pestell's employment without Cause or if Dr. Pestell resigns for Good Reason, then Dr. Pestell is entitled to receive, *inter alia*, "continued payment of [his] then-current Base Salary for the longer of (x) the remainder of the Basic Term and (y) twelve (12) months," as well as payment of any Annual or Supplemental Bonus payable but not yet paid and a pro-rata bonus for the fiscal year in which the cessation of his employment occurred.

64.     Section 4.1(c) additionally provides that, in the event of Dr. Pestell's termination without Cause or resignation for Good Reason, "all stock options and other awards" that Dr. Pestell has "shall vest and, in the case of stock options or like awards, become exercisable, to the extent not already vested and (if applicable) exercisable, on the Termination Date and the exercise period for all such stock options shall be extended until the date that is one (1) year after the effective date of termination of employment."

65.     The Stock Restriction Agreement entered into between Dr. Pestell, the Company, and ProstaGene on November 16, 2018 provides that the "Repurchase Option" restriction on Dr. Pestell's Restricted Stock "will automatically lapse and all shares subject to the Repurchase Option will immediately become fully vested and no longer subject to the Repurchase Option . . . if the Stockholder's employment under the Employment Agreement is terminated (x) by the Company without Cause . . . [or] (y) by the Stockholder for Good Reason."

66.     Section 4.2 of the Employment Agreement addresses termination for Cause and voluntary resignation.   Pursuant to Section 4.2(a), "[t]he Company may terminate the Executive's employment hereunder at any time for Cause upon written notice to the Executive. The Executive may voluntarily terminate his employment hereunder at any time for any reason or no reason upon ninety (90) days written notice to the Company."   Section 4.2(b) provides that,

in such event, the Executive shall only receive the "Accrued Obligations," which consist of accrued but unpaid salary, vacation, reimbursements, and vested benefits.

67.     Section 5.6 of the Employment Agreement provides that the Employment Agreement shall be governed by and construed in accordance with Delaware law.

68.     The Company announced the hiring of Dr. Pestell as CMO in its Form 8-K Current Report filed with the U.S. Securities and Exchange Commission (the "SEC") on November 19, 2018, to which the Employment Agreement is attached as Exhibit 10.5.

69.     At the time the Employment Agreement was executed, Dr. Pestell was based in and performed his duties as CMO from Wynnewood, Pennsylvania.  The Board and the CEO subsequently decided to open an office in Fort Lauderdale, Florida, in order to expand the Company's national presence and facilitate meetings with candidate investors located on the East Coast.  In connection with this plan, Dr. Pestell agreed to relocate to Fort Lauderdale and did so in March 2019.

*Deterioration of the Relationship Between Dr. Pestell and the Company*

70.     Dr. Pestell and the Company initially enjoyed a good relationship.  Indeed, in February 2019 the Company raised Dr. Pestell's salary by 50% (from $400,000 to $600,000) in recognition of his performance as CMO, and later approved the award of additional incentive compensation to Dr. Pestell for exceeding objectives.

71.     In his capacity as CMO and a director of the Company, Dr. Pestell worked closely with the CEO.  From time to time, Dr. Pestell raised concerns regarding certain actions taken by the CEO, including but not limited to actions in connection with public representations, regulatory submissions, program safety, hiring of consultants and advisors, contract execution, strategic planning, and program delays.

72.     Although Dr. Pestell and the CEO initially maintained a cordial working relationship, their relationship rapidly deteriorated following Dr. Pestell's objections in late June 2019 to the CEO concerning an investigational new drug application ("IND") and protocol to be submitted to the FDA despite the fact that Dr. Pestell, as the CMO, and another expert had determined that the protocol, as then drafted, was not safe for the study subjects.

73.     Specifically, on June 20, 2019, the CEO, who has no medical training, demanded that the clinical trial office at Amarex Clinical Research LLC ("Amarex") "submit the IND and protocol that you had made for colon cancer for submission to the FDA by tomorrow and let [Professor] John [Marshall, Consultant to CytoDyn] know that we are not waiting for him any longer."

74.     Dr. Pestell pushed back on the CEO's attempts to rush the submission because, the week prior, on June 12, 2019, Dr. Pestell had determined that the protocol was unsafe because it would likely lead to a higher incidence of side effects, placing patients at unnecessary risk.  For those reasons, Dr. Pestell and Professor Marshall, a colon cancer subject matter expert who had previously worked with Dr. Pestell from 2002 to 2005 and is currently a consultant to CytoDyn, agreed that changes should be made to the protocol.

75.     Dr. Pestell, Professor Marshall, and Amarex recommended a safer and more efficacious revised protocol, which adjusted the dose and timing of the chemotherapeutic agents to be provided to patients.  The initial draft study proposed a daily 160 mg starting dose of regorafenib, plus weekly subcutaneous administration of leronlimab.  However, regorafenib can have severe side effects at that starting dosage, which research has shown are lessened by starting with a lower dose, which is then gradually escalated.  The protocol revision endorsed by

Dr. Pestell, Professor Marshall, and Amarex accordingly recommended a dose escalation of 80, 120, and 160 mg of regorafenib, in combination with the administration of leronlimab.

76.     Despite this recommendation from experts in the field, and despite Dr. Pestell's authority for leading and implementing the Company's clinical programs, the CEO instead proposed submitting the original protocol with Dr. Pestell's name removed.  This interference with Dr. Pestell's authority and performance of his duties constituted a breach of Section 2.2 of the Employment Agreement.

77.     Ultimately, Amarex declined to submit the original protocol, and only then did the CEO relent and follow Dr. Pestell's recommendation.

78.     Over the course of the following weeks, however, the CEO embarked on an effort to retaliate against Dr. Pestell by obstructing his ability to carry out his responsibilities, relieving him of his authority over various matters, and ultimately leading the effort to terminate his employment.

79.     As a result, the Company breached nearly every facet of Section 2.2 of the Employment Agreement, breached the termination provisions set forth in Article 4 of the Employment Agreement, and violated the WPCL.  To make matters worse, the Company then published defamatory statements regarding the basis for Dr. Pestell's termination.   These violations of law and contract are set forth in detail below.

*The Company's Failure to Support the Oncology Research Laboratory*

80.    The Company's cancer research laboratory is essential for the development of the Company's programs in oncology and cancer metastasis, has a number of unique characteristics that cannot be readily replicated (including the experience and longevity of its team members), and is required to conduct oncology research activities that have been announced to the public.

81.    Indeed, the laboratory's unique assets were, in part, the basis for the Company's acquisition of ProstaGene, as part of which the Company made a strategic decision to develop and focus on its oncology program.

82.    Following the acquisition, in a November 26, 2018 press release, the Company represented to the public that cancer research is one of the "pillars" of the Company's business. In a February 19, 2019 press release, the Company touted the benefits of acquiring the "prestigious laboratory . . . operat[ing] under the guidance of Dr. Pestell."

83.    Dr. Pestell was the face of the Company's oncology program and, as Section 2.2 of the Employment Agreement makes clear, had "direct responsibility" for directing and leading the Company's "development programs in oncology."

84.    Prior to Dr. Pestell's termination, the laboratory was, in accordance with the stated goals of the Company's oncology research strategy, engaging in two primary activities: 1) studying the functional synergy between CCR5 inhibitors with PARP inhibitors, to provide data which would enable the Company to find strategic partners in the oncology space; and 2) conducting research to support potential pre-clinical studies regarding melanoma, pancreatic, prostate, colon, lung, liver, and stomach cancer (collectively, the "8 IND").

85.    The laboratory is administered through the Doylestown, Pennsylvania-based Baruch S. Blumberg Institute ("Blumberg"), pursuant to a Master Sponsored Research

Agreement dated January 1, 2017 between Blumberg and the Company, as assignee of ProstaGene.

86.    On May 6, 2019, two Statements of Work were initiated under the Master Sponsored Research Agreement, for preclinical studies relating to the effectiveness of leronlimab (PRO 140) for metastatic cancer.  Staff, including researchers recruited from other countries, were hired to carry out these preclinical studies.

87.    On July 8, 2019, however, Dr. Pestell learned that the Company – apparently at the direction of the CEO – had decided to cancel these studies.

88.    Dr. Pestell was not consulted regarding this decision, despite his authority and responsibilities regarding the development and implementation of oncology development programs.

89.    Rather, Dr. Pestell indirectly learned of this decision when he received Cash Forecasts for the July 8, 2019 meeting of the Board's Finance Committee (of which he was a member), and observed that all funding for pre-clinical laboratory activity during the fourth quarter of 2019 and during 2020 and 2021 had been removed from the Company's budget.

90.    These funds were apparently reallocated from the oncology franchise to HIV-related reproductive monkey studies.  Thus, the change in funding was not done to reduce expenditures, as those funds were just moved to a different segment of the business.

91.    Dr. Pestell was informed by the CFO that the Company intended to terminate the two Statements of Work for the preclinical studies.

92.    On July 9, 2019, the Company sent a letter to Blumberg terminating the contracts.

93.     The next day, July 10, 2019, the Company sent a second letter to Blumberg "rescind[ing]" its termination from the day before and advising that the Statements of Work "remain in effect" (the "Rescission Letter").

94.     However, the contracts were not secure, as the Company remained in default of its payment obligations to Blumberg.

95.     Blumberg's President Timothy Block responded to the Rescission Letter on July 12, 2019, explaining that "[p]erhaps it can be appreciated how disturbing and threatening the events of the past week have been to the overall program stability and operations within [Blumberg], and in particular, to those working on the project (several scientists have been recruited and relocated to the area expressly for this work)."  Dr. Block also noted that the Company owed $71,428.00 to Blumberg for work performed but not yet paid for.  For these reasons, Blumberg requested (1) immediate payment for all funds owed, (2) 1-year notice for termination going forward, and (3) 6 months of advance payment for future work.

96.     On July 19, 2019, Lou Kassa, Blumberg's Executive Vice President & COO, advised the Company that if Blumberg did not "receive payment by July 26th, we might have to terminate our staff since the Cytodyn revenue is covering their salaries and benefits."

97.     In his capacity as CMO, Dr. Pestell bore responsibility, under Section 2.2 of the Employment Agreement, for "the Company's pipeline and development programs in oncology and immunology for PRO 140" and was to be "actively engaged" in defining "overall business strategy and direction for the Company's clinical development plans, including strategic development and implementation of clinical programs."

98.     Decisions concerning the cancellation of preclinical research contracts and the funding of the preclinical research laboratory fell within the purview of Dr. Pestell's

responsibilities and authority.  The Company's actions in excluding Dr. Pestell from involvement in decisions regarding these matters constituted a material breach of Section 2.2 of the Employment Agreement.

99.     Further, by failing to support the Company's oncology program and research laboratory, the Company, at the direction of its CEO, undercut Dr. Pestell's ability to "provid[e] direction and leadership" in these areas and unreasonably interfered with his ability to fulfill the obligations outlined in the Employment Agreement.

100.    On July 29, 2019, the Company once again terminated the Statements of Work with Blumberg (despite having rescinded its prior termination).  The Company's CFO sent a letter to Dr. Block at Blumberg, advising Dr. Block that the Company: 1) would "review the due dates of the open invoices," 2) would not agree to provide 1-year notification for termination, and 3) would not provide 6 months of advance payment.  The letter then stated: "In conclusion, we hereby provide thirty (30) days' written notice to terminate each of the previously-referenced Statements of Work."

101.    Because the preclinical studies contemplated in the Statements of Work will no longer go forward, Blumberg has been forced to terminate the employment of at least 2 of the laboratory's personnel.  Certain of these individuals obtained U.S. Visas to relocate from other countries, such that their loss of employment may affect their immigration status.

102.    In addition to failing to support the oncology laboratory, the Company has similarly failed to support the Company's Scientific Advisory Board (the "SAB"), for which Dr. Pestell has "oversight responsibilities" under the Employment Agreement.

103.    Despite the Company's representation to the public in March 2018 that a SAB would be created, the SAB members still had not, as of Dr. Pestell's termination, received

contracts or payments relating to their membership.  In response to Dr. Pestell's requests for funding of the SAB, the CEO stated, on July 5, 2019, that no SAB would be formed "until after September [2019]."

*The Company's Placement of Severe Restrictions on Contact Between Dr. Pestell*
*and Other Employees, Team Members, and Strategic Partners*

104.    The Company, acting through its CEO, unduly interfered with Dr. Pestell's performance of his duties under Section 2.2 of the Employment Agreement by prohibiting and/or restricting his ability to communicate with key individuals, including the Company's other employees, the Company's legal team, members of his research team, and various strategic partners.

105.    On June 24, 2019, the CEO sent an email to Dr. Pestell and the Company's counsel at Lowenstein Sandler LLP which instructed Dr. Pestell to "not reach out to Steve [Skolnick], Jamie [O'Grady], or any of CytoDyn's legal team for any matter," without first obtaining permission from the CEO.

106.    On July 3, 2019, the CEO sent another email to Dr. Pestell which expanded his restriction regarding communications to "*anybody affiliated to CytoDyn for any CytoDyn's [sic] business*" (emphasis added).  The CEO then provided a list of individuals he did not want Dr. Pestell to speak with without permission, which included, but was "not limit[ed]" to: all Amarex personnel, including Dr. Kush Dhody (VP, Clinical Operations), Dr. Karem Kazempour (President & CEO), Tariq Shah (Regulatory & Scientific Analyst), and Hana Mekonnen (VP, Biometrics); Dr. Bruce Patterson; the Company's Senior Science Advisor, Dr. Jonah Sacha; the Company's counsel at Lowenstein Sandler; the Company's patent attorney, Chandra Edit; the Company's Chief Technology Officer, Nitya Ray; the Company's Senior VP of Business

Development, Brendan Rae; the Company's Head of Investor Relations, Marek Ciszewski; the Company's CFO, Michael Mulholland; and the Company's Controller, Craig Eastwood.

107.    Later that same day, Dr. Pestell asked the CEO for clarification regarding any additional individuals with whom he should not speak.  The CEO replied, "*Anyone that has anything to do with CytoDyn (for example shareholders).*" (emphasis added).

108.    In subsequent correspondence on July 5, 2019, Dr. Pestell identified numerous issues about which he needed to speak with people listed in the CEO's July 3 email, and asked for further clarification regarding the manner in which these communications should be handled. The CEO responded that for most of the people on the list the CEO needed to be included on any calls and copied on all email communications, but that Dr. Pestell should have "no communications" with Marek Ciszewski and "no communication . . . for the next 4 weeks" with Michael Mulholland or Craig Eastwood.

109.    The CEO reiterated these restrictions in another email, on July 10, 2019, and advised that Dr. Pestell could have communications with "your own people who you brought to us," but not with anyone that had a relationship with CytoDyn prior to Dr. Pestell's involvement with the Company.

110.    Dr. Pestell also received an email on July 8, 2019 from the CFO, apparently sent at the CEO's direction, in which Dr. Pestell was advised to "not contact directly" the Company's internal management, the Company's bankers or attorneys, or the media, and to instead route all such communications through the CEO.

111.    These restrictions hindered and would continue to hinder Dr. Pestell's performance of his duties as CMO under Section 2.2 of the Employment Agreement in numerous respects.

112.    For example, Dr. Pestell was wrongly precluded from "be[ing] actively engaged in assisting to define the overall business strategy" as a result of restrictions on freely communicating with other executives and key personnel at the Company.

113.    Dr. Pestell was wrongly precluded from engaging in Company fundraising, which constituted a significant portion of his day-to-day work (and was needed to fund the programs for which Dr. Pestell was responsible), as a result of restrictions on communicating with the Company's financial team, bankers, fundraising entities, and shareholders.

114.    Dr. Pestell was wrongly precluded from "providing direction and leadership for . . . pipeline and development programs in oncology and immunology . . . and implementation of clinical programs" as a result of restrictions on regularly and freely communicating with Amarex personnel.  Amarex provides critical services for the Company's clinical trials, including clinical trial writing and regulatory and medical monitoring of the trial.   Maintaining a close working relationship and timely interactions with Amarex was thus key to Dr. Pestell's role as CMO and to the maintenance of sufficient safety standards for clinical programs.

115.    Dr. Pestell was wrongly precluded from engaging in "strategic development" or "collaboration with strategic partners" as a result of restrictions on having contact with key individuals involved in those efforts.  The CEO instructed Dr. Pestell to not communicate with such individuals, including but not limited to Dr. William Olson of Regeneron, with whom Dr. Pestell was planning to meet in an effort to form a strategic partnership, and shareholder Billy Espy, who had been assisting Dr. Pestell and Board member Carl Dockery in identifying strategic oncology opportunities with Goldman, Sachs & Co.

116.    Dr. Pestell was wrongly precluded from conducting "further exploration of new and existing patent protection for PRO 140 in oncology and immunology" as a result of restrictions on communicating or coordinating with the Company's patent counsel.

117.    As the above examples demonstrate, having been barred from freely communicating with key individuals in programs for which he was responsible, Dr. Pestell was precluded from effectively performing his duties as CMO.

118.    The restrictions described above prevented Dr. Pestell from performing his duties under the Employment Agreement and stripped Dr. Pestell of the authority granted to him, all in material breach of the Employment Agreement.

*The Company's Appointment of a Chief Science Officer,*
*Whose Scope of Work Intruded Upon the Responsibilities of the CMO*

119.    On July 1, 2019, the CEO sent an email to the members of the Board (other than Dr. Pestell), copying the CFO and legal counsel, in which he sought "board permission to terminate Dr. Pestell's employment agreement with CytoDyn 'for cause'" (the "July 1 Email").

120.    The CEO proposed naming Board Chairman Scott Kelly as interim CMO, despite the fact that the Chairman's background is in physical medicine and rehabilitation rather than pharmaceutical or diagnostic development in oncology or HIV.  Upon information and belief, Dr. Kelly has no experience in designing, operating, and analyzing clinical trials in oncology or HIV.

121.    As supposed support for the CEO's attempt to fire Dr. Pestell "for cause," the CEO made a series of spurious accusations regarding Dr. Pestell's conduct, including, *inter alia*, that Dr. Pestell was uncooperative, had misrepresented information regarding programs and patents, and had failed to respond to communications and requests.  These accusations are

baseless, constitute misrepresentations by the CEO to the Board, and are easily refuted by email and telephone records (among other documents).

122.     Moreover, the various grievances lodged by the CEO in the July 1 Email are insufficient as a matter of law to constitute "Cause," as that term is defined in Section 4.1(b) of the Employment Agreement.

123.     At least one Board member, Carl Dockery, pushed back on this improper attempt to fire Dr. Pestell, highlighting the imprudence of hastily firing "our public face of the cancer program, our largest shareholder, a fellow board member, and our only claim to expertise in cancer" without first conducting a fair, independent, and impartial investigation.

124.     No such investigation was conducted.

125.     On July 14, 2019 – after the plan set forth in the July 1 Email had fizzled – the CEO proposed a new plan to the Board: appoint the Chairman to a newly-created Chief Science Officer ("CSO") position, for which he would be paid $20,000 per month, plus a stock option.

126.     The proposal set forth the following scope of responsibilities for the CSO: "Manage CytoDyn's scientific, technological and research operations; Oversee scientific functions of CytoDyn, including basic and applied research projects, as well as the development of new processes, technologies or products; Combine discipline-specific knowledge with leadership and business skills to promote the efficiency, profitability and competitive position of CytoDyn."

127.     On July 15, 2019, the Board voted 4-3 to approve the Chairman as the Company's new CSO.

128.     Dr. Pestell voted "No" as to the creation of the CSO position and the appointment of the Chairman because, as he explained at the July 15, 2019 Board meeting: 1) the CSO's

scope of work included responsibilities which were already within the purview of and being performed by Dr. Pestell, the CMO; 2) the Chairman does not have the necessary qualifications in research or clinical trials; and 3) the use of funds for that purpose was not an appropriate strategic investment.

129.    The Company filed a Form 8-K with the SEC on July 19, 2019, announcing the Chairman's new role as CSO.

130.    The responsibilities granted to the CSO include matters that were already under the authority of Dr. Pestell as CMO.   In particular, the CSO's broad charge to "[m]anage CytoDyn's scientific, technological and research operations" and "[o]versee scientific functions . . . including basic and applied research projects" intruded upon Dr. Pestell's authority to lead the development and implementation of the Company's clinical research programs.

131.    Given the overlap in responsibilities, as well as the events leading up to the creation of the CSO position, the appointment of the Chairman as CSO was a transparent effort to materially diminish Dr. Pestell's role at the Company and effectively supplant his position as CMO, all of which constituted a material breach of Section 2.2 of the Employment Agreement.

*The Company's Unreasonable Interference with*
*Clinical Programs and Strategic Initiatives*

132.    In addition to the material breaches of the Employment Agreement set forth above, the Company on numerous occasions unreasonably interfered with Dr. Pestell's ability to conduct the clinical development programs and strategic initiatives for which he was responsible as CMO.

133.    In multiple instances, Dr. Pestell was excluded from important decisions regarding studies and programs within the scope of his duties as CMO.

134.    For example, on July 1, 2019 the Company issued a press release regarding an anticipated collaboration with Dr. Bruce Patterson relating to diagnostic tests using PRO 140 – a topic obviously within the scope of Dr. Pestell's responsibilities for "development programs in oncology and immunology for PRO 140" and "exploration of new and existing patent protection for PRO 140" – without providing Dr. Pestell with a chance to review it first.

135.    After the release had been made public without his input, Dr. Pestell asked to speak with the Company's patent counsel, Chandra Edit, about its impact on another of the Company's patent applications and on a licensing agreement currently in discussion but was told by the CEO not to speak with her.

136.    Dr. Pestell previously recommended to the CEO and the Board that all cancer-related press releases be reviewed by the CMO and by CytoDyn's legal counsel prior to release, to avoid unnecessary risk to the Company due to statements which are inaccurate or cannot be substantiated.  This recommendation was not followed.

137.    Dr. Pestell was also excluded from public interviews regarding the Company's research activities.

138.    The last public interview in which Dr. Pestell participated was on June 4, 2019 with Proactive Investors, a public relations firm.

139.    Since then, however, the CEO conducted additional interviews with Proactive Investors relating to PRO 140 and the Company's oncology and immunology programs without Dr. Pestell's involvement or input, including on the following dates: June 7, 2019 ("CytoDyn to meet with FDA to finalize next steps on leronlimab drug trial for HIV"); June 17, 2019 ("CytoDyn CEO talks about latest HIV trial featuring its flagship drug, leronlimab"); June 21, 2019 ("CytoDyn to meet with FDA on prostate-cancer test, applies HIV screening test to

monotherapy trial"); June 24, 2019 ("CytoDyn to meet with FDA to discuss prostate cancer-detection test"); July 2, 2019 ("CytoDyn anticipates near-term revenue from cell diagnostic company IncellDX"); and July 8, 2019 ("CytoDyn brings on senior science advisor to develop leronlimab to treat HIV PrEP").[3]

140.    Given that Dr. Pestell was the face of the Company's oncology program and was directly responsible for "pipeline and development programs in oncology and immunology for PRO 140" under his Employment Agreement, there was no excuse for excluding him from involvement with and participation in public interviews relating to these topics.

141.    The Company also interfered with Dr. Pestell's duties by defunding the pre-clinical studies for which he was responsible.  As referenced above, the Company's July 8, 2019 Cash Forecasts did not allocate any funds to pre-clinical research and development for the fourth quarter of 2019 or for 2020 or 2021, and allocated only $132,500 for the third quarter of 2019. The Company's prior forecasts, dated June 3, 2019, had allocated a total of $2,252,500 for pre-clinical research and development through 2021, and the forecasts before that (dated May 17, 2019) had allocated $3,465,000 for the same time period.

142.    Dr. Pestell could not lead the Company's pre-clinical studies without funding or support.  Further, there were patents and samples which had already been acquired (and which the CEO had made announcements to the public regarding), but which Dr. Pestell and his team could not develop or study without funding.

143.    Dr. Pestell was also unable to move forward with certain studies for which he was responsible because the Company failed to sign the necessary contracts.

---

[3]     Videos of these interviews are posted publicly on Proactive Investors' website, at https://www.proactiveinvestors.com/OTCMKTS:CYDY/CytoDyn/.

144.   For example, the ProstaGene Prognostic Test could not move forward until the Company hired bioinformatician Dr. Andrew Kossenkov to generate data for the Company's 510(k) application to the FDA and for the Company's contemplated licensing agreement with NanoString.  But Dr. Kossenkov's hiring was delayed because, despite having received the most recent iteration of Dr. Kossenkov's contract from his counsel on June 13, 2019, as of July 22, 2019 the Company still had not engaged in further discussions regarding the contract or signed it.

145.   In another example, the 8 IND study (the initiation of which the Company announced to the public in February 2019) could not move forward until Amarex received a signed contract to conduct work on the study.  However, as of July 22, 2019, to Dr. Pestell's knowledge, Amarex had yet to receive a contract for the 8 IND study.

146.   In another example, the Company delayed signing the necessary contract to commence the triple negative breast cancer clinical trial (the "TNBC trial").

147.   The FDA approved CytoDyn's IND submission for the TNBC trial on November 23, 2018, and CytoDyn announced the initiation of the TNBC trial to the public via press release on November 26, 2018.  However, the anticipated timelines provided in the press release – that the Company intended to "start the TNBC trial this year" (*i.e.*, by the end of 2018) and dose patients during the first quarter of 2019 – were not accurate or reasonable, given that the typical time (per industry standards) needed for preparing, planning, and obtaining all necessary approvals for the trial in advance of being able to start accepting patients is closer to 11 months, not 1 or 2 months.

148.   Dr. Pestell and his team worked tirelessly to prepare the TNBC trial, such that it was ready to start accruing patients within 9 months.  In the words of Dr. Massimo Cristofanilli,

the principal investigator of the TNBC trial, being ready to accrue patients "just 9 months" after initiating the trial, was "a remarkable achievement in Oncology!"

149.    The only thing preventing the acceptance of patients at that point was that the CEO had not yet signed the required contract with Northwestern University ("Northwestern").

150.    The CEO had received multiple requests from Northwestern in June 2019 to sign the contract needed to commence the trial and begin accruing patients.  During June and early July 2019, shareholders were also inquiring about the status of the TNBC trial and whether it was ready to move forward.

151.    The CEO, in his July 1 Email, represented to the Board that Dr. Pestell had failed to "work with the CEO to expedite the TNBC trial," ignored the CEO's "constant request[s]" relating to the trial, and been uncooperative with regard to the trial.  These representations – used to support the CEO's request to terminate Dr. Pestell's employment – were false.  In reality, Dr. Pestell and his team had completed all necessary preparations for the commencement of the TNBC trial at that point, and the only thing preventing it from moving forward was that *the CEO* had yet to sign the contract with Northwestern.

152.    The CEO signed the contract with Northwestern on July 8, 2019.

153.    Nonetheless, when asked during a July 30, 2019 earnings call when the contract with Northwestern had been signed, the CEO answered that it had been signed "many months ago."

*The Company's Imposition of Additional Contingencies*
*on the Payment of Dr. Pestell's Bonus*

154.    In addition to the efforts set forth above to diminish and interfere with Dr. Pestell's authority under the Employment Agreement – which included, among other things,

stifling Dr. Pestell's ability to meet fundraising goals – the Company also recently purported to impose new contingencies upon the payment of Dr. Pestell's fundraising-related bonus.

155.    On June 19, 2019, the CEO emailed Dr. Pestell telling him that his bonus had been "approved and evaluated by [the] compensation committee" but would be paid out "50% after first $15 million raised.  50% after second $15 million."

156.    Although Section 3.1 of the Employment Agreement provides the Board with discretion to pay the bonus partially in cash and partially in stock, it does *not* include the 50% holdback pending further fundraising that is described in the CEO's June 19, 2019 email.

*Termination of Dr. Pestell's Employment*

157.    On July 22, 2019, Dr. Pestell, through his counsel, sent a letter to the Company (the "Notice Letter") in accordance with Section 4.1 of the Employment Agreement, which notified the Company as to conduct and conditions constituting Good Reason for him to resign as an employee of the Company.  A true and correct copy of the Notice Letter is attached hereto as Exhibit C.

158.    The Notice Letter was directed to the CEO's attention and copied the Company's attorney Michael J. Lerner, Esq., of Lowenstein Sandler LLP, as required by Section 5.5 of the Employment Agreement.

159.    The conduct and conditions detailed in the Notice Letter (and herein, above) constituted "material breach[es] by the Company of the terms of th[e] [Employment] Agreement," and thus constituted Good Reason for Dr. Pestell's resignation under Section 4.1(b)(1) of the Employment Agreement.

160.    Those actions also had the effect of materially diminishing Dr. Pestell's authority, duties, and responsibilities as CMO, without his consent, such that Good Reason for his resignation also existed under Section 4.1(b)(3) of the Employment Agreement.

161.    The conduct and conditions complained of in the Notice Letter (and herein, above) occurred within the 90 days prior to the date of the Notice Letter.

162.    The Notice Letter provided the Company with thirty-five (35) days to cure the conditions and rescind the complained of conduct, if and to the extent any such cure was possible, and notified the Company of Dr. Pestell's intention to resign for Good Reason in the absence of such cure.

163.    On the same day, July 22, 2019, Board member Carl Dockery sent a separate letter to the Board highlighting other issues which he felt warranted the Board's attention, including concerns relating to the CEO's conduct, the Company's ability to raise capital, and recent efforts to remove Mr. Dockery from the Board.

164.    A Board meeting had been scheduled for July 23, 2019, but was postponed following the Company's receipt of the Notice Letter and Mr. Dockery's letter.

165.    The meeting was rescheduled for Thursday, July 25, 2019 at 9:15 pm EST, and held via conference call.

166.    In advance of the call, the CFO distributed a meeting agenda to the Board which listed 4 topics relating to the management of the Company which would be presented for approval and/or discussion by the Board.  The agenda also listed a fifth topic entitled only "Executive session," with no further explanation.

167.    Dr. Pestell, the CEO, the Chairman, Mr. Dockery, and Board members David Welch, Jordan Naydenov, and Michael Klump participated in the Board call on July 25, 2019.

168.    Board member Gregory Gould did not participate in the call because he was on a plane at the time.  Prior to the meeting, Mr. Gould had spoken to the Chairman and expressed his disappointment that the call had been scheduled during the only time (out of various proposed

times spanning a three-day period) that Mr. Gould could not attend.  The Chairman responded

(falsely) that nothing unusual would occur during the call, so Mr. Gould's absence would not be

an issue.  The Chairman then reviewed the other four items on the agenda for the call (one of

which related to forming a special committee to review the issues raised in the Notice Letter and

in Mr. Dockery's letter), but notably did not mention anything to Mr. Gould about terminating

Dr. Pestell's employment.

169.    Upon information and belief, the Chairman purposefully excluded Mr. Gould

from the July 25, 2019 Board call and did not tell him that Dr. Pestell's termination would be

discussed because the CEO and the Chairman knew that Mr. Gould would oppose the

termination of Dr. Pestell's employment.

170.    The call began with discussion of the first four topics listed on the meeting

agenda.  Thereafter, Dr. Pestell was asked to leave the line so that the remaining Board members

could have the "Executive session" closed discussion.

171.    Approximately 15 minutes after Dr. Pestell left the line, he received a message

from the Chairman asking Dr. Pestell to call him.  Dr. Pestell did not do so.

172.    Shortly thereafter, at 11:07 pm EST, Dr. Pestell received an email from the

Chairman, on which the Company's counsel and the CEO were copied, advising Dr. Pestell that

"[t]he Board of Directors of CytoDyn has decided to terminate your employment for cause.

Please refer to the attached letter."   The attached letter (the "Termination Letter") from the

Chairman stated in relevant part:

> Please accept this letter as notice, pursuant to Section 4.2(a) of the
> Employment Agreement, that your employment with the Company is
> hereby terminated effective today, July 25, 2019 (the "Separation Date")
> for Cause.  Among other reasons, the Board has determined you willfully
> and continuously have failed to perform the duties or obligations
> reasonably assigned to you by the Board from time to time, and that such

> willful and continued failure is not susceptible to cure, as determined in the sole judgment and discretion of the Board.

A true and correct copy of the Termination Letter is attached hereto as <u>Exhibit D</u>.

173.    The Termination Letter contains no further explanation or identification of any "willful and continued failure" or other conduct purportedly constituting Cause for Dr. Pestell's termination.

174.    The Company's assertion of Cause in the Termination Letter is baseless and pretextual.

175.    No Cause of any kind – whether "willful and continued failure . . . to perform the duties or obligations reasonably assigned" or otherwise – existed under Section 4.1 of the Employment Agreement.

176.    Upon information and belief, given the minimal length of time between when Dr. Pestell was asked to leave the Board call and when he was contacted by the Chairman, the Board did not engage in a meaningful discussion regarding the termination of Dr. Pestell's employment.

177.    To Dr. Pestell's knowledge, no written materials regarding the basis for Dr. Pestell's termination were provided to the Board in connection with the July 25, 2019 Board call. Dr. Pestell was not given an opportunity to respond to any accusations that may have been lodged against him during the "executive session" discussion.

178.    Upon information and belief, no meaningful investigation was conducted concerning the issues raised in the Notice Letter.

179.    As a result of his termination, Dr. Pestell was also deemed to resign from the Board, pursuant to Section 4.6 of the Employment Agreement.

180.    The Termination Letter states that Dr. Pestell will receive his "final paycheck" on the next regular pay day after the date of his termination, and that Dr. Pestell's participation in the Company's group health insurance plan "will end on July 31, 2019."

181.    On the morning of July 26, 2019, the day after terminating Dr. Pestell's employment, the Company issued a press release entitled *CytoDyn Executes Exclusive Worldwide Licensing Agreement with IncellDX for PA-14 and PRO 140 for Diagnostic Testing Purposes* (the "July 26 Press Release").

182.    The July 26 Press Release includes the following paragraph: "The Company also announced that its Board of Directors terminated the employment of Dr. Richard G. Pestell, the Company's Chief Medical Officer, for cause pursuant to the terms of his employment agreement with the Company and pursuant to the terms of his employment agreement, upon such termination, Dr. Pestell resigned from his position as a director of the Company."

183.    The same day, the Company filed a Form 8-K Current Report with the SEC (the "July 26 8-K"), which similarly announced to the public that Dr. Pestell's employment as CMO had been "terminated . . . for cause pursuant to the terms of his employment agreement."

184.    These announcements led members of the public, posting on an "Investors Hub" message board (https://investorshub.advfn.com/Cytodyn-Inc-CYDY-4762/), to hypothesize about the reasons for Dr. Pestell's termination.  Several posters referred directly to the language in Dr. Pestell's Employment Agreement, and speculated on which category of Cause was at issue.

185.    On August 21, 2019, the Company filed a Schedule 14A Proxy Statement with the SEC (the "August 21 14A") which again represented to the public that Dr. Pestell's termination had been "for cause."  The August 21 14A further represents that the Company

anticipates that Dr. Pestell's bonus "will not be paid" and that his stock options "will expire unvested" because of the "for cause" termination.

186.    The statements in the July 26 Press Release, July 26 8-K, and August 21 14A have damaged Dr. Pestell's reputation and constitute libel *per se* because they falsely disparage Dr. Pestell's performance of his duties as CMO and falsely imply that Dr. Pestell may have acted dishonestly or criminally (given the type of conduct included within the Employment Agreement's definition of Cause).

187.    The Company acted with actual malice (or, at the very least, negligently) in falsely representing to the public that Cause existed for Dr. Pestell's termination, and is accordingly liable to Dr. Pestell for compensatory and punitive damages.

### *The Company's Attempt to Repurchase the Restricted Stock*

188.    As set forth above, Dr. Pestell, the Company, and ProstaGene are parties to the Stock Restriction Agreement, concerning 8,342,000 shares of CytoDyn common stock owned by Dr. Pestell.

189.    Under Section 1 of the Stock Restriction Agreement, the Company's ability to exercise the Repurchase Option depends on the nature of Dr. Pestell's separation from the Company.  Specifically, in the event of a termination for Cause the Company can repurchase the Restricted Stock for $0.001 per share, but in the event of a termination without Cause or resignation for Good Reason, the Repurchase Option automatically lapses.

190.    On September 13, 2019, the Company sent Dr. Pestell a letter notifying him that "[d]ue to [his] termination for cause" the Company intended to exercise the Repurchase Option.  The letter enclosed a check for $8,342.00 and advised that the Company "expects to deliver to its

Transfer Agent a letter which instructs the Transfer Agent to effect the transfer of the Restricted Stock to the Company's name on or about September 18, 2019."

191.    On September 18, 2019, Dr. Pestell, through his counsel, sent a letter to the Company's Transfer Agent, Computershare Trust Company, N.A., notifying it that the parties' respective rights to the Restricted Stock are the subject of Dr. Pestell's claim for declaratory relief in the instant litigation.  The letter further advised the Transfer Agent that Dr. Pestell disputes the Company's right to repurchase the Restricted Stock and demands that it remain in his name pending the outcome of this litigation.  The CFO and the Company's counsel were copied on this letter.

192.    Because Cause did not actually exist for the termination of his employment, Dr. Pestell is entitled to keep the Restricted Stock without it being subject to any further restrictions, or to be compensated by the Company for the full market value of any shares of Restricted Stock improperly transferred out of his name.

## COUNT ONE – BREACH OF CONTRACT
### (Against the Company)

193.    Paragraphs 1 through 192 above are incorporated herein by reference, as if fully set forth herein.

194.    As more particularly set forth above, Dr. Pestell and the Company are parties to the Employment Agreement.

195.    The Employment Agreement is valid and enforceable.

196.    The Employment Agreement sets forth, *inter alia*, the scope of Dr. Pestell's authority, duties, and responsibilities as CMO, as well as the rights and obligations of the parties with respect to the termination of Dr. Pestell's employment.

197.    Dr. Pestell performed his duties as CMO in accordance with the terms and conditions of the Employment Agreement.

198.    By engaging in conduct with the purpose and effect of inhibiting and obstructing Dr. Pestell's performance of his duties, and diminishing the scope of those duties, the Company breached the Employment Agreement.   As more particularly set forth above, these breaches include, but are not limited to:

    a.    endangering the existence of the oncology research laboratory and programs;

    b.    defunding preclinical activities;

    c.    placing undue restrictions on Dr. Pestell's ability to communicate with employees and others with whom he needed to interact to properly execute his duties as CMO;

    d.    supplanting his role as CMO with the appointment of a CSO who had many of the same duties as Dr. Pestell; and

    e.    excluding Dr. Pestell from involvement in important decisions regarding matters within his authority.

199.    By placing new contingencies not found in the Employment Agreement upon the payment of Dr. Pestell's fundraising-related bonus, the Company breached the Employment Agreement.

200.    The Notice Letter properly notified the Company that Good Reason existed for Dr. Pestell's resignation, described in detail the conduct and conditions constituting Good

Reason, and provided a 35-day period for cure, in compliance with Section 4.1(a) of the Employment Agreement.

201.    Rather than complying with its obligations to Dr. Pestell in the event of his resignation for Good Reason, the Company preemptively terminated Dr. Pestell based on a false assertion of Cause.

202.    By terminating Dr. Pestell "for Cause" when no such Cause actually existed, the Company breached the Employment Agreement.

203.    By refusing to comply with its obligations under the Employment Agreement (including those set forth in Section 4.1(c)), the Company breached the Employment Agreement.

204.    As a result of the Company's breaches of its duties and obligations under the Employment Agreement, Dr. Pestell has incurred substantial damages in excess of $1,300,000, which include but are not limited to the obligations owed to him under Section 4.1(c) of the Employment Agreement (collectively, the "Separation Obligations"), which include:

    a.    the Accrued Obligations;

    b.    severance in the form of continued payment of Dr. Pestell's Base Salary for the remainder of the Basic Term (*i.e.*, through November 2021), to be paid in accordance with the Company's regular payroll schedule;

    c.    waiver of the applicable premium otherwise payable for COBRA continuation coverage or a monthly reimbursement for an equivalent health insurance policy, for twelve months;

    d.    payment of any Annual or Supplemental Bonus payable but not yet paid and a pro-rata bonus for the fiscal year in which the cessation of his employment occurred; and

e.      vesting of his stock options and like awards as of the date of his termination, and extension of the exercise period for such options until one (1) year after the date of his termination.

205.    The Company is liable to Dr. Pestell for these damages.

206.    The Company is further liable to Dr. Pestell for any damages arising from the Company's improper attempt to exercise the Repurchase Option under the Stock Restriction Agreement based on a false assertion of Cause, including but not limited to, compensation for the full market value of any shares of Restricted Stock wrongfully transferred out of his name.

### COUNT TWO – VIOLATION OF PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW (43 P.S. § 260.1, *et seq.*) (Against the Company, the CEO, and the Chairman)

207.    Paragraphs 1 through 206 above are incorporated herein by reference, as if fully set forth herein.

208.    The WPCL (43 P.S. § 260.1, *et seq.*) requires employers to, *inter alia*, pay all wages owed to a separated employee on the next regularly scheduled payday and to pay all fringe benefits and wage supplements within 10 days after such payments are required to be made.  *See also* 43 P.S. § 260.3.

209.    "Employer" is defined broadly under Section 260.2a of the WPCL as including, *inter alia*, every corporation, and any agent or officer thereof, that employs any person in the Commonwealth of Pennsylvania.

210.    At the time the parties entered into the Employment Agreement, Dr. Pestell was a resident of Pennsylvania.  Section 2.5 of the Employment Agreement provides that "[t]he Executive's principal place of business for the performance of his duties under th[e] [Employment] Agreement shall be in Wynnewood, Pennsylvania."

211.    Because the Company employed Dr. Pestell in the Commonwealth of Pennsylvania, it is an employer under the WPCL.  For the same reason, Dr. Pestell is an employee protected by the WPCL.

212.    The CEO and the Chairman are agents and/or officers of the Company who, as more particularly set forth above, had authority over, and played an active role in, decisions concerning Dr. Pestell's employment with the Company (including the termination thereof).  The CEO and the Chairman were acting in their official capacities on behalf of the Company when they took the actions complained of herein, including causing the Company to violate the WPCL. They are thus liable, along with the Company, as employers under the WPCL.

213.    "Wages" are defined under the WPCL as "includ[ing] all earnings of an employe[e], regardless of whether determined on time, task, piece, commission or other method of calculation," as well as "fringe benefits or wage supplements," which includes, among other things, "separation, vacation, holiday, or guaranteed pay" and "any other amount to be paid pursuant to an agreement to the employe[e], a third party or fund for the benefit of employe[e]s."

214.    Section 260.3 of the WPCL requires "every employer who by agreement . . . agrees to pay or provide fringe benefits or wage supplements" to pay or provide such benefits or supplements "as required . . . within 10 days after such payments are required to be made directly to the employe[e]."

215.     Because Cause did not exist for Dr. Pestell's termination, he is entitled to be paid or provided with the Separation Obligations, as enumerated in Section 4.1(c) of the Employment Agreement.

216.    The Separation Obligations constitute "fringe benefits or wage supplements" under the WPCL.

217.     Section 4.1(c) of the Employment Agreement specifies the time period(s) in which the Separation Obligations are to be paid or provided by the Company.

218.     Defendants have refused to pay or provide Dr. Pestell with the Separation Obligations to which he is entitled under the Employment Agreement and, in doing so, have violated Section 260.3 of the WPCL.

219.     In addition, on June 19, 2019, the CEO told Dr. Pestell that although the Board's Compensation Committee had evaluated and approved Dr. Pestell's bonus, the bonus would not be paid out until certain fundraising goals were met – contingencies not provided for in the Employment Agreement.

220.     The bonus constitutes wages and/or a fringe benefit or wage supplement under the WPCL.

221.     By withholding some or all of the bonus based on contingencies not contained in the Employment Agreement, Defendants violated Sections 260.3, 260.5, and/or 260.6 of the WPCL.

222.     Defendants are liable to Dr. Pestell for the Separation Obligations and all unpaid bonus amounts or other wages, as well as liquidated damages in accordance with Section 260.10 of the WPCL.

223.     Pursuant to Section 260.9a(f) of the WPCL, Defendants are also liable for the attorneys' fees and costs incurred by Dr. Pestell in his efforts to enforce his rights under the WPCL.

<u>**COUNT THREE – DECLARATORY JUDGMENT**</u>
**(Against the Company)**

224.     Paragraphs 1 through 223 above are incorporated herein by reference, as if fully set forth herein.

225. An actual controversy has arisen and now exists between Dr. Pestell and the Company with respect to the Restricted Stock and Dr. Pestell's stock options.

226. The Stock Restriction Agreement provides that, if the Company terminates Dr. Pestell's employment without Cause or if Dr. Pestell resigns for Good Reason, then the Repurchase Option restriction on the Restricted Stock "will automatically lapse and all shares subject to the Repurchase Option will immediately become fully vested and no longer subject to the Repurchase Option."

227. The Employment Agreement provides that, if the Company terminates Dr. Pestell's employment without Cause or if Dr. Pestell resigns for Good Reason, then "all stock options and other awards" that Dr. Pestell has "shall vest and, in the case of stock options or like awards, become exercisable, to the extent not already vested and (if applicable) exercisable, on the Termination Date and the exercise period for all such stock options shall be extended until the date that is one (1) year after the effective date of termination of employment."

228. As more particularly set forth above, Good Reason existed for Dr. Pestell's resignation from the Company.

229. As more particularly set forth above, the Company characterized Dr. Pestell's termination as one for Cause, even though Cause did not exist.

230. Pursuant to the Delaware Declaratory Judgment Act, 10 Del. C. § 6501, *et seq.*, Dr. Pestell hereby requests that the Court enter a declaratory judgment (the "Declaratory Judgment") that Dr. Pestell's separation from the Company was in the nature of a resignation for Good Reason or a termination without Cause, such that: (i) the Restricted Stock is fully vested and no longer subject to the Repurchase Option, and (ii) Dr. Pestell's stock options are fully

vested, were not forfeited, and may be exercised during the one-year period following Dr. Pestell's separation.

## COUNT FOUR – DEFAMATION
### (Against the Company)

231.    Paragraphs 1 through 230 above are incorporated herein by reference, as if fully set forth herein.

232.    The July 26 Press Release, July 26 8-K, and August 21 14A announced to the public that Dr. Pestell had been terminated from his employment with the Company "for cause."

233.    The July 26 Press Release was issued via GlobeNewswire, is publicly available on the Company's website, and was also disseminated via email to investors and others by the Company's Investor Relations team.

234.    The July 26 8-K is a public filing accessible through the SEC's EDGAR database, and is also available on the Company's website.

235.    The August 21 14A is a public filing accessible through the SEC's EDGAR database, and is also available on the Company's website.

236.    The July 26 Press Release, July 26 8-K, and August 21 14A identify Dr. Pestell by name, and falsely assert that Cause existed for his termination.

237.    The Company's false assertions in the July 26 Press Release, July 26 8-K, and August 21 14A were made in writing, and thus constitute libel.

238.    The July 26 Press Release, July 26 8-K, and August 21 14A caused harm to Dr. Pestell's reputation by falsely representing to the public that he had engaged in conduct constituting Cause for his termination.

239.    The Company acted negligently or with actual malice in falsely representing that Cause existed for Dr. Pestell's termination.

240.    The statements in the July 26 Press Release, July 26 8-K, and August 21 14A that Dr. Pestell had been fired "for cause" are defamatory *per se* because: (1) they malign Dr. Pestell in his trade or business; and (2) they falsely suggest that Dr. Pestell may have committed a crime of moral turpitude, given that acts of thievery or fraud and conviction of a felony are included within the definition of Cause in the Employment Agreement (which is publicly available as part of the Company's SEC filings).

241.    As set forth above, Dr. Pestell has spent over 37 years developing his reputation nationally and internationally, and is one of the most respected physician-scientists in the world in his fields of expertise.  The Company's false statements regarding his performance as CMO are damaging to his reputation and his ability to obtain other employment or appointments.

242.    As a result of the defamatory statements in the July 26 Press Release, July 26 8-K, and August 21 14A, Dr. Pestell has suffered material and reputational harm, for which he is entitled to recover damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendants, and respectfully requests that this Honorable Court award Plaintiff the following relief:

(a)    damages to which Plaintiff is entitled under the Employment Agreement and/or the WPCL, including the Separation Obligations, in an amount which has yet to be fully determined but which exceeds $1,300,000;

(b)    compensatory damages in an amount to be determined at trial for material and reputational harm caused to Plaintiff;

(c)    entry of the Declaratory Judgment;

(d)      punitive damages;

(e)      attorneys' fees and costs;

(f)      prejudgment and post-judgment interest;

(g)      such additional relief as this Court deems just and proper.

Respectfully submitted,

Dated: September 27, 2019

/s/ Michael C. Hochman
Michael C. Hochman (DE No. 4265)
Monzack Mersky McLaughlin and Browder, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE 19801
Tel: (302) 656-8162
Fax: (302) 656-2769
mhochman@monlaw.com

-and-

Steven M. Coren (admitted *pro hac vice*)
Benjamin M. Mather (admitted *pro hac vice*)
Janice I. Daul (admitted *pro hac vice*)
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
bmather@kcr-law.com
jdaul@kcr-law.com

*Counsel for Plaintiff*
*Richard G. Pestell, M.D., Ph.D*