## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RICHARD G. PESTELL, M.D., PH.D.,

       Plaintiff,

    v.

CYTODYN INC.; CYTODYN OPERATIONS
INC.; NADER Z. POURHASSAN, PH.D.;
AND SCOTT A. KELLY, M.D.,

       Defendants.

Civil Action No. 1:19-cv-01563-RGA

## PLAINTIFF'S OPPOSITION TO DEFENDANTS CYTODYN
## INC. AND CYTODYN OPERATIONS INC.'S PARTIAL
## MOTION TO DISMISS THE AMENDED COMPLAINT

KAUFMAN, COREN & RESS, P.C.
Steven M. Coren, Esq.
Benjamin M. Mather, Esq.
Janice I. Daul, Esq.
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
bmather@kcr-law.com
jdaul@kcr-law.com
Admitted *Pro Hac Vice*

MONZACK MERSKY MCLAUGHLIN AND
BROWDER, P.A.
Michael C. Hochman (DE No. 4265)
1201 N. Orange Street, Suite 400
Wilmington, DE 19801
Tel: (302) 656-8162
Fax: (302) 656-2769
mhochman@monlaw.com

*Attorneys for Plaintiff*
*Richard G. Pestell, M.D., Ph.D.*

Dated:  November 8, 2019

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDING................................................1

II.   INTRODUCTION .........................................................................................1

III.  FACTUAL BACKGROUND ...........................................................................3

    A.  The ProstaGene Acquisition .................................................................3

    B.  The Employment Agreement ................................................................4

    C.  Deterioration of the Relationship Between Dr. Pestell and the Company....................6

    D.  Termination of Dr. Pestell's Employment .................................................7

IV.   STANDARD OF REVIEW ...........................................................................10

V.    ARGUMENT .............................................................................................10

    A.  The Amended Complaint States a Claim for Defamation ..........................................10

        1.  The Amended Complaint Sufficiently Alleges Falsity....................................11

        2.  Qualified Privilege Does Not Provide A Basis for Dismissal of Plaintiff's Claim Because Plaintiff Pleads Actual Malice and Knowledge of Falsity on the Part of the Company ........................................14

    B.  The Amended Complaint States a Claim Under the Pennsylvania WPCL .................17

VI.   CONCLUSION...........................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Andrews v. Cross Atl. Capital Partners, Inc.*, 158 A.3d 123 (Pa. Super. 2017)...........................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................10

*Burr v. Atl. Aviation Corp.*, 348 A.2d 179 (Del. 1975) ...............................................................14

*Carney v. Mem. Hosp. and Nursing Home of Greene Cty.*, 475 N.E.2d 451 (N.Y. 1985)...........13

*Eastland v. Du Pont*, 1996 WL 421940 (E.D. Pa. July 23, 1996) .........................................19, 20

*Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 383 (S.D.N.Y. 2018)...............13, 15

*Gonzalez v. Avon Prods., Inc.*, 609 F. Supp. 1555 (D. Del. 1985) .............................................16

*Hampshire Group, Ltd. v. Kuttner*, 2010 WL 2739995 (Del. Ch. July 12, 2010) ......................15

*Hides v. CertainTeed Corp.*, 1995 WL 458786 (E.D. Pa. July 26, 1995) ..................................20

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004)................................................10

*In re DVI, Inc.*, 2008 WL 4239120 (Bankr. D. Del. Sept. 16, 2008)...........................................11

*Jesse v. Sphinx Systemhouse, Inc.*, 2011 WL 5865491 (N.D. Ill. Nov. 17, 2011)......................20

*Killian v. McCulloch*, 873 F. Supp. 938 (E.D. Pa. 1995), *aff'd sub nom.*, *Stadler v. McCulloch*, 82 F.3d 406 (Table) (3d Cir. 1996)......................................................................................19

*Leyshon v. Diehl Controls of N. Am., Inc.*, 946 N.E.2d 864 (Ill. App. 2010).......................12, 13

*McGoldrick v. TruePosition, Inc.*, 623 F. Supp. 2d 619 (E.D. Pa. 2009) ...................................18

*McLeod v. McLeod*, 2015 WL 853334 (Del. Super. Feb. 26, 2015)......................................14, 15

*Meades v. Wilmington Housing Auth.*, 875 A.2d 632 (Table) (Del. May 12, 2005) ...................14

*Moretti v. Hertz Corp.*, 2017 WL 1032783 (D. Del. Mar. 17, 2017) .........................................17

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)....................................................10

*Pierce v. Burns*, 185 A.2d 477 (Del. 1962) ....................................................................14, 15, 16

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) ........................................................................10

*Scott v. Vantage Corp.*, 295 F. Supp. 3d 433 (D. Del. 2017) .....................................................10

*Spence v. Funk*, 396 A.2d 967 (Del. 1978) ................................................................................11

*Stiner v. Univ. of Del.*, 243 F. Supp. 2d 106 (D. Del. 2003)...........................................10, 14, 17

*Weber v. FujiFilm Med. Sys. U.S.A., Inc.*, 854 F. Supp. 2d 219 (D. Conn. 2012).......................13

*Wooleyhan v. Cape Henlopen School Dist.*, 2011 WL 1875710 (D. Del. May 17, 2011) .....14, 16

**Statutes**

Pennsylvania Wage Payment & Collection Law, 43 P.S. § 260.1, *et seq.* ................................. 17

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ........................................................................... *passim*

Federal Rule of Civil Procedure 15(a)(1)(B) ............................................................................ 1

Plaintiff Richard G. Pestell, M.D., Ph.D. ("Plaintiff" or "Dr. Pestell"), by and through his undersigned counsel, submits this memorandum of law in opposition to the Partial Motion to Dismiss (D.I. 17) (the "Motion") filed by Defendants CytoDyn Inc. and CytoDyn Operations Inc. (collectively, "CytoDyn" or the "Company").

## I.     NATURE AND STAGE OF THE PROCEEDING

Plaintiff commenced this suit on August 22, 2019 by filing the Complaint against the Company, Nader Z. Pourhassan, Ph.D. (the "CEO"), and Scott A. Kelly, M.D. (the "Chairman," and together with the CEO, collectively, the "Individual Defendants"). The Company moved to partially dismiss the Complaint, which the Individual Defendants joined. *See* D.I. 11 and D.I. 14. Thereafter, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff filed the First Amended Complaint. *See* D.I. 15 (the "Amended Complaint" or "Am. Compl."). The Amended Complaint asserts claims for: (i) breach of contract, against the Company; (ii) violation of the Pennsylvania Wage Payment and Collection Law (the "WPCL"), against the Company and the Individual Defendants; (iii) declaratory judgment; and (iv) defamation, against the Company. The Company filed a motion to dismiss the WPCL and defamation claims pursuant to Federal Rule of Civil Procedure 12(b)(6),[1] to which Plaintiff objects and responds herein.

## II.    INTRODUCTION

Dr. Pestell joined CytoDyn in November 2018 as a member of its Board of Directors (the "Board") and as its Chief Medical Officer ("CMO"), pursuant to the terms of an Employment Agreement (the "Employment Agreement") dated November 16, 2018. On July 25, 2019 –

---

[1]      To the extent the Company also purports to "adopt" personal jurisdiction arguments made by the Individual Defendants in their motion to dismiss (D.I. 18), those arguments: (1) do not apply to the CytoDyn entities, which admit they are incorporated in and subject to personal jurisdiction in Delaware (*see* Motion, ¶ 17), and (2) are fully addressed in Plaintiff's opposition to the Individual Defendants' motion to dismiss, filed contemporaneously herewith and incorporated herein by reference.

following retaliatory efforts to strip him of his authority as CMO and interfere with his ability to perform his duties – the Company terminated Plaintiff's employment.  As a pretext for firing him, the Company asserted the existence of "Cause" (which is narrowly defined in the Employment Agreement), even though it knew that Cause did not actually exist.  The Company then issued public announcements that Dr. Pestell had been terminated for Cause.

The Company seeks dismissal of Dr. Pestell's defamation claim based on the affirmative defenses of truth and qualified privilege.  Neither of these arguments justify dismissal.  The obvious import of announcing that Dr. Pestell had been "terminated for Cause" is that he had engaged in conduct constituting Cause – a representation which, as alleged in the Amended Complaint, the Company knew to be false.  Moreover, qualified privilege will be forfeited when it is exercised with actual malice, in bad faith, or with knowledge of falsity or the desire to cause harm.  Dr. Pestell's allegations concerning the retaliatory actions undertaken by the Company and its agents to remove him from his role as CMO, combined with allegations that the Company knew Cause for termination did not actually exist, are more than sufficient to allege abuse (and thus forfeiture) of any privilege which may have existed.  The mere assertion of "for cause" publicly, when in fact, there is none, does not provide safe harbor for the Company.

The Company also seeks dismissal of Dr. Pestell's WPCL claim, based solely on the fact that, by the time the Company fired Dr. Pestell, he had moved to Florida.  This argument is meritless because: 1) Section 2.5 of the Employment Agreement specifically defines the "principal place of business" for purposes of the contract as Wynnewood, Pennsylvania, and 2) even after Dr. Pestell moved to Florida, he remained in charge of the Company's oncology research activities being conducted in the Company's Pennsylvania-based laboratory.

At a minimum, accepting all factual allegations as true, and construing the Amended Complaint in the light most favorable to Plaintiff, the Amended Complaint states a claim to relief that is "plausible on its face," and the Motion should be denied.

## III.    FACTUAL BACKGROUND

### A.    The ProstaGene Acquisition

CytoDyn is a publicly-traded biotechnology company based in Washington, focused on the clinical development of Leronlimab (also known as PRO 140) for the treatment and prevention of HIV infection and, more recently, for the treatment of cancer and certain inflammatory diseases.  Am. Compl., ¶¶ 1, 33-34.  As part of its effort to expand its clinical focus into the areas of cancer and immunological conditions, in 2018 CytoDyn acquired substantially all of the assets and rights, and assumed certain obligations and liabilities, of ProstaGene, LLC ("ProstaGene"), a privately held biotechnology start-up founded in 2011 by Dr. Pestell and based in the Philadelphia area.  *Id.*, ¶¶ 1, 30, 34-35.  The terms of the transaction are set forth in the Transaction Agreement, dated August 27, 2018.  *Id.*, ¶ 35.  Closing on the transaction occurred on November 16, 2018 (the "Closing").  *Id.*, ¶ 39.

The assets CytoDyn acquired from ProstaGene consisted primarily of intellectual property and intellectual property rights, as well as control over ProstaGene's cancer research laboratory, which operated "under the guidance of Dr. Pestell" and was administered through the Baruch S. Blumberg Institute ("Blumberg") located in Doylestown, Pennsylvania.  *Id.*, ¶¶ 40, 81-82, 85.  As consideration for these assets, CytoDyn issued 27,000,000 common shares (the "Acquisition Shares") to ProstaGene.  *Id.*, ¶ 40; *see also id.*, ¶¶ 41-43, 46-47 (setting forth Dr. Pestell's actual or beneficial interests in certain of the Acquisition Shares).

B.        **The Employment Agreement**

On November 16, 2018, CytoDyn and Dr. Pestell entered into the Employment Agreement, which set forth the terms and conditions of Dr. Pestell's employment relationship with CytoDyn.  *Id.*, ¶ 52 and Employment Agreement attached to the Amended Complaint as Exhibit A.  Section 2.2 of the Employment Agreement set forth the scope of Dr. Pestell's duties and responsibilities as CMO, which included, *inter alia*, having "direct responsibility for providing direction and leadership for the Company's pipeline and development programs in oncology and immunology for PRO 140" and being "actively engaged in assisting to define the overall business strategy and direction for the Company's clinical development plans, including strategic development and implementation of clinical programs, collaboration with strategic partners and further exploration of new and existing patent protection for PRO 140."  Am. Compl., ¶ 54.

Section 1.2 of the Employment Agreement provided for a 3-year term of employment. *Id.*, ¶ 55.  Dr. Pestell's initial base salary was $400,000 per year, which was increased to $600,000 per year in February 2019.  *Id.*, ¶¶ 56-57.  Dr. Pestell was also eligible to receive an "Annual Bonus," which had a target amount of 50% of his base salary and would be determined by the Board and/or the Compensation Committee, and a "Supplemental Bonus," which would be determined in the "sole discretion" of the Board.  *Id.*, ¶ 58.

Article 4 of the Employment Agreement sets forth the provisions governing termination of Dr. Pestell's employment with the Company, including circumstances in which the Company could terminate his employment for "Cause" and in which Dr. Pestell could resign from the Company for "Good Reason."  *Id.*, ¶¶ 59-60, 66.  "Cause," as defined in the Employment Agreement, includes (i) fraud or other acts intended to enrich Plaintiff at the expense of the

Company; (ii) conviction of a felony; (iii) willful, continued, and uncured failure to perform duties or obligations; or (iv) material violations of the Covenants Agreement. *See id.*, ¶ 61.

"Good Reason," as defined in the Employment Agreements, includes, *inter alia*, a material breach of the Employment Agreement by the Company and a material diminution in Plaintiff's authority, duties, or responsibilities. *See id.*, ¶ 62. Dr. Pestell "[could] resign for Good Reason provided he notifies the Company within ninety (90) days of the occurrence of any of the conditions that he reasonable [sic] considers to be a 'Good Reason' condition and provides the Company with at least thirty (30) days in which to cure the condition," in accordance with Section 4.1(a) of the Employment Agreement. *Id.*, ¶ 60.

If the Company terminated Dr. Pestell's employment without Cause or if Dr. Pestell resigned for Good Reason, then Dr. Pestell was entitled to receive, *inter alia*, "continued payment of [his] then-current Base Salary for the longer of (x) the remainder of the Basic Term and (y) twelve (12) months," as well as payment of any Annual or Supplemental Bonus payable but not yet paid and a pro-rata bonus for the fiscal year in which the cessation of his employment occurred. *Id.*, ¶ 63. Dr. Pestell's stock options would also vest and become exercisable. *See id.*, ¶ 64. In addition, stock restrictions on 8,342,000 of Dr. Pestell's shares would "automatically lapse." *Id.*, ¶¶ 43, 65 and Stock Restriction Agreement attached to the Amended Complaint as Exhibit B.

Section 4.2 of the Employment Agreement addresses termination for Cause and voluntary resignation. *See* Am. Compl., ¶ 66. In such event, the Executive shall only receive the "Accrued Obligations," which consist of accrued but unpaid salary, vacation, reimbursements, and vested benefits. *Id.*

At the time the Employment Agreement was executed, Dr. Pestell was a resident of Pennsylvania.  *Id.*, ¶¶ 69, 210.  Section 2.5 of the Employment Agreement provides that "[t]he Executive's principal place of business for the performance of his duties under th[e] [Employment] Agreement shall be in Wynnewood, Pennsylvania."  *Id.*, ¶ 210.  Subsequently, CytoDyn's Board and the CEO decided to open an office in Fort Lauderdale, Florida, in order to expand the Company's national presence and facilitate meetings with candidate investors located on the East Coast.  *Id.*, ¶ 69.  In connection with that plan, Dr. Pestell moved to Fort Lauderdale in March 2019.  *Id.*

### C.    Deterioration of the Relationship Between Dr. Pestell and the Company

Although Dr. Pestell and the Company initially enjoyed a good relationship, his relationship with the CEO rapidly deteriorated following Dr. Pestell's objections in late June 2019 to the CEO relating to the submission of an investigational new drug application and protocol to the FDA.  *Id.*, ¶¶ 70, 72-77.  Following this dispute, the CEO embarked on an effort to retaliate against Dr. Pestell by obstructing his ability to carry out his duties, relieving him of his authority over various matters, and ultimately leading the effort to terminate his employment. *Id.*, ¶ 78.

Indeed, beginning in June 2019, the Company, often acting through the CEO, inhibited and obstructed Dr. Pestell's performance of his duties as CMO at every turn, including by:

- failing to support or fund the Company's oncology research laboratory and preclinical activities, which were essential for the development of oncology and cancer metastasis research programs under Dr. Pestell's authority (*see id.*, ¶¶ 80, 83, 86-99, 141-46);

- prohibiting Dr. Pestell from communicating with employees and others with whom he needed to interact to properly and effectively perform his duties as CMO (*see id.*, ¶¶ 104-17);

- excluding Dr. Pestell from important decisions, meetings, and public interviews regarding matters within his purview as CMO (*see id.*, ¶¶ 88-89, 98, 133-40); and

- appointing the Chairman as "Chief Science Officer" and assigning him numerous responsibilities which were already under the authority of and being performed by Dr. Pestell as the CMO (*see id.*, ¶¶ 120, 125-31).

On July 1, 2019, the CEO sent an email to the members of Board (other than Dr. Pestell) seeking "board permission to terminate Dr. Pestell's employment agreement with CytoDyn 'for cause'" (the "July 1 Email"). *Id.*, ¶ 119. As supposed support for his attempt to fire Dr. Pestell, the CEO made a series of false accusations regarding Dr. Pestell's conduct (which, in any event, did not amount to Cause), including that Dr. Pestell was uncooperative, had misrepresented information regarding programs and patents, and failed to respond to communications and requests. *Id.*, ¶¶ 120-22. Board member Carl Dockery pushed back on this improper attempt to fire Dr. Pestell and recommended that a fair, independent, and impartial investigation be conducted regarding the CEO's accusations, but no such investigation was ever performed. *Id.*, ¶¶ 123-24.

### D.    Termination of Dr. Pestell's Employment

On July 22, 2019, Dr. Pestell, through his counsel, sent a letter to the Company (the "Notice Letter") in accordance with Section 4.1 of the Employment Agreement, which notified the Company that its conduct in obstructing his ability to perform his duties as CMO constituted a breach of the Employment Agreement and had the effect of materially diminishing his

authority, duties, and responsibilities, such that Good Reason existed for his resignation.  *Id.*, ¶¶ 157, 159-60 and Notice Letter attached to the Amended Complaint as Exhibit C.

A Board meeting had been scheduled for July 23, 2019, but was postponed following the Company's receipt of the Notice Letter and of another letter (also dated July 22, 2019) from Mr. Dockery.[2]  Am. Compl., ¶ 164.  The meeting was rescheduled to July 25, 2019 at 9:15 pm EST, and held via conference call.  *Id.*, ¶ 165.  In advance of the call, the CFO distributed a meeting agenda to the Board which listed 4 topics relating to the management of the Company which would be presented for approval and/or discussion by the Board, as well as a fifth topic entitled only "Executive session," with no further explanation.  *Id.*, ¶ 166.

Dr. Pestell, the CEO, the Chairman, and all of the other Board members except Gregory Gould participated in the meeting.  *Id.*, ¶ 167.  Mr. Gould was unable to attend because he was on a plane at the time.  *Id.*, ¶ 168.  Upon information and belief, the CEO and the Chairman purposefully scheduled the call at a time when Mr. Gould could not attend because they knew that he would oppose the termination of Dr. Pestell's employment.  *Id.*, ¶¶ 168-69.  Prior to the meeting, the Chairman falsely told Mr. Gould that nothing unusual would occur during the call.  *Id.*, ¶ 168.  And, despite reviewing the other four agenda items with Mr. Gould (one of which concerned the formation of a special committee to investigate issues raised in the Notice Letter), the Chairman did not tell him that Dr. Pestell's termination would be discussed.  *Id.*

The July 25, 2019 Board call began with discussion of the other topics on the agenda, after which Dr. Pestell was asked to leave the line so the remaining Board members could have the "Executive session" closed discussion.  *Id.*, ¶ 170.  Approximately 15 minutes later, the

---

[2]    Mr. Dockery's letter to the Board highlighted several other issues which he felt warranted the Board's attention, including concerns relating to the CEO's conduct, the Company's ability to raise capital, and recent efforts to remove Mr. Dockery from the Board.  Am. Compl., ¶ 163.

Chairman sent a message asking Dr. Pestell to call him. *Id.*, ¶ 171. Shortly thereafter, at 11:07 pm EST, Dr. Pestell received an email from the Chairman advising Dr. Pestell that "the Board of Directors of CytoDyn has decided to terminate your employment for cause. Please refer to the attached letter." (the "Termination Letter"). *Id.*, ¶ 172 and Termination Letter attached to the Amended Complaint as Exhibit D.[3] As supposed justification for Dr. Pestell's "for cause" firing, the Termination Letter states that "Among other reasons, the Board has determined you willfully and continuously have failed to perform the duties or obligations reasonably assigned to you by the Board from time to time, and that such willful and continued failure is not susceptible to cure, as determined in the sole judgment and discretion of the Board." Am. Compl., ¶¶ 172-73. The Termination Letter contains no further explanation or identification of any "willful or continued failure" or other conduct purportedly constituting Cause. *Id.* The Company's assertion of Cause is baseless and pretextual. *Id.*, ¶ 174.

On the morning of July 26, 2019, the day after terminating Dr. Pestell's employment, the Company issued a press release (the "July 26 Press Release"), which includes the statement that the Board had "terminated the employment of Dr. Richard G. Pestell, the Company's Chief Medical Officer, for cause pursuant to the terms of his employment agreement with the Company." *Id.*, ¶¶ 181-82. The same day, the Company also filed a Form 8-K (the "July 26 8-K") with the Securities and Exchange Commission (the "SEC") stating that Dr. Pestell had been "terminated . . . for cause pursuant to the terms of his employment agreement." *Id.*, ¶ 183. The Company's Schedule 14A Proxy Statement filed with the SEC on August 21, 2019 (the "August 21 14A") again represented that Dr. Pestell's termination had been "for cause." *Id.*, ¶ 185. However, Dr. Pestell had not actually engaged in conduct constituting Cause for his termination,

---

[3] As a result of his termination, Dr. Pestell was also deemed to resign from the Board, pursuant to Section 4.6 of the Employment Agreement. Am. Compl., ¶ 179.

and the Company's assertions otherwise in the Termination Letter and in subsequent public announcements were knowingly false. *Id.*, ¶¶ 4, 174-75, 186.

## IV.    STANDARD OF REVIEW

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) *(citation omitted)*. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve disputed facts or decide the merits of the case." *Scott v. Vantage Corp.*, 295 F. Supp. 3d 433, 437 (D. Del. 2017).  A plaintiff is not required to anticipate, overcome, or "plead around" affirmative defenses in the complaint.  *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004); *see also Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014).

## V.    ARGUMENT

### A.    The Amended Complaint States a Claim for Defamation

Defamation consists of the twin torts of libel (written defamation) and slander (oral defamation).  *Stiner v. Univ. of Del.*, 243 F. Supp. 2d 106, 115 (D. Del. 2003).  To state a claim for defamation under Delaware law, Plaintiff must plead five elements: "(1) the defamatory character of the communication; (2) publication; (3) that the communication refers to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." *Id.*  Statements which impute "1) a crime, or 2) a loathsome disease, or 3) specific

misdoing affecting the complainant's business, trade or profession, or 4) unchastity" to the subject are considered defamatory *per se* and do not require proof of special damages. *Spence v. Funk*, 396 A.2d 967, 969 n.1 (Del. 1978).

Plaintiff alleges that the Company engaged in libel *per se* when it announced to the public in the July 26 Press Release, July 26 8-K, and August 21 14A that Dr. Pestell had been "terminated for cause," because those statements falsely asserted that he had engaged in conduct constituting Cause for his termination (thereby maligning him in his profession, and suggesting he may have committed a crime), even though – as the Company was aware – Cause did not actually exist. *See* Am. Compl., ¶¶ 186-87, 232-42.

The Company seeks dismissal of Plaintiff's defamation claim based on two arguments: 1) that the statements at issue are true, and 2) that publication of the statements is protected by a qualified privilege. These arguments are without merit and fail to provide a basis for dismissal. Neither factual disagreements nor affirmative defenses are appropriate for resolution at the pleading stage. *See*, *e.g.*, *In re DVI, Inc.*, 2008 WL 4239120, at *11 (Bankr. D. Del. Sept. 16, 2008) ("An affirmative defense with disputed facts is not a proper basis to dismiss a complaint."). The Amended Complaint is replete with allegations of falsity regarding the Company's public statements as to the existence of Cause and of malice on the part of the Company and those acting on its behalf. *See*, *e.g.*, Am. Compl., ¶¶ 186-87, 232-42.

## 1.    The Amended Complaint Sufficiently Alleges Falsity

The Amended Complaint alleges that the Company's assertion of Cause in the Termination Letter was false, pretextual, and concocted in an attempt to justify his termination,[4] and that the Company's subsequent public announcements relating to his termination

---

[4]    *See*, *e.g.*, Am. Compl., ¶¶ 172-77.

disseminated the knowingly false statement that Cause existed.  *See* Am. Compl., ¶ 182 (July 26 Press Release announcing termination "for cause pursuant to the terms of his employment agreement"), ¶ 183 (July 26 8-K, announcing same), ¶ 185 (August 21 14A, representing termination had been "for cause").

Ignoring these allegations, the Company argues that Plaintiff's defamation claim must be dismissed because it "indisputably is true" that the reason for his termination was Cause.  *See* Motion, ¶ 1.  But, as the Amended Complaint alleges, the Company *knew* that Cause did not actually exist when it made the announcements at issue.  Rather, Plaintiff's termination was the end result of a retaliatory scheme led by the CEO to strip Plaintiff of his duties, which the Company attempted to justify by claiming Cause existed for termination.  *See, e.g.*, Am. Compl., ¶¶ 2, 4, 78, 119, 121, 168, 173-77.  The Company's representations to the public then had the effect of falsely imputing professional failure, misconduct, and other wrongdoing to Plaintiff, given that under the Employment Agreement (which is publicly available, via the Company's SEC filings), the definition of Cause includes, *inter alia*, acts of thievery or fraud, conviction of a felony, and failure to perform professional duties.  *See id.*, Ex. A, Employment Agreement, § 4.1(b).

Courts examining facts similar to those alleged here have found that they support a claim for defamation.  For example, in *Leyshon v. Diehl Controls of N. Am., Inc.*, 946 N.E.2d 864 (Ill. App. 2010), the Appellate Court of Illinois affirmed the entry of judgment and award of damages on a defamation *per se* claim, where the company's chairman told another employee that an executive had engaged in behavior constituting "cause" under his employment agreement, even though the chairman knew the statement was false and a pretext to avoid paying the executive's benefits.  In *Leyshon*, the executive's claims were based on a "premeditated scheme" by the

company to fire him without paying him severance benefits, in furtherance of which the company "terminated [him] for cause, representing that he had committed acts of gross misconduct, when in fact, there were no grounds for firing the plaintiff." *Id.* at 869, 883; *see also Carney v. Mem. Hosp. and Nursing Home of Greene Cty.*, 475 N.E.2d 451, 453 (N.Y. 1985) (holding that plaintiff stated claim for defamation based on allegedly false statement in newspaper that he had been discharged "for cause," and that such a statement is susceptible of defamatory meaning because it suggests professional incompetence); *Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 383, 385-86 (S.D.N.Y. 2018) (plaintiff stated defamation claim based on company's representation in SEC filings that he had been terminated "'for cause' as that term is defined in his employment agreement," where plaintiff alleged he had properly performed his duties and that the company fabricated reasons to fire him to avoid paying him benefits); *Weber v. FujiFilm Med. Sys. U.S.A., Inc.*, 854 F. Supp. 2d 219, 234-35 (D. Conn. 2012) (denying summary judgment on defamation claim where evidence of animus precluded summary judgment because it may demonstrate "improper or unjustifiable motive" in connection with plaintiff's termination and subsequent publication that he had been fired for cause).

The Company is not insulated from liability for defamation by the fact that it first included its false assertion in the Termination Letter.[5]  There is no dispute that the Termination Letter *characterizes* the termination as "for Cause," but given Plaintiff's allegations regarding

---

[5]  The Company accuses Plaintiff of "bootstrapp[ing]" his defamation claim to his contract claim.  *See* Motion, ¶ 7.  It is not clear what the Company means by "bootstrap[ing]" in this context, but, in any event, Plaintiff's defamation claim is not identical to, or based on the same conduct as, his contract claim.  Plaintiff's contract claim is based on the Company's interference with the performance of his duties and wrongful termination of his employment.  *See* Am. Compl., Count One.  Plaintiff's defamation claim is based on the publication of knowingly-false statements as to the existence of Cause for termination.  *See id.*, Count Four.  Nothing prevents Plaintiff from asserting both of these claims, provided he sufficiently pleads all requisite elements, as he has done.

the falsity of that statement there is plainly a factual dispute concerning the truth of the Company's subsequent public announcements in that regard.  Because this issue implicates factual determinations which cannot be made at the pleading stage, Plaintiff's defamation claim should not be dismissed on this basis.

> ### 2.   Qualified Privilege Does Not Provide A Basis for Dismissal of Plaintiff's Claim Because Plaintiff Pleads Actual Malice and Knowledge of Falsity on the Part of the Company

Delaware recognizes a qualified (or conditional) privilege for "communications made between persons who have a common interest for the protection of which the allegedly defamatory statements are made."  *Stiner*, 243 F. Supp. 2d at 115.  "[T]he qualified privilege protects statements disclosed to any person who has a legitimate expectation in the subject matter."  *Id.*  However, a qualified privilege "must be exercised 'with good faith, without malice and absent any knowledge of falsity or desire to cause harm.'"  *Id.* (*quoting Burr v. Atl. Aviation Corp.*, 348 A.2d 179, 181 (Del. 1975)).  "If the conditional privilege is abused, the benefit of the privilege may be waived or forfeited."  *Meades v. Wilmington Housing Auth.*, 875 A.2d 632 (Table) (Del. May 12, 2005).  While it is for the Court to determine whether the privilege applies, "the jury resolves contested factual issues of whether the privilege was abused." *Wooleyhan v. Cape Henlopen School Dist.*, 2011 WL 1875710, at *23 (D. Del. May 17, 2011) (*citing Pierce v. Burns*, 185 A.2d 477, 480 (Del. 1962)); *see also McLeod v. McLeod*, 2015 WL 853334, at *4 (Del. Super. Feb. 26, 2015) ("[W]hether a conditional privilege has been abused is ordinarily a question of fact.").

The Company argues that Plaintiff's defamation claim should be dismissed on the basis of qualified privilege because the statements were made in public disclosures and because Plaintiff fails to plead actual malice.  These arguments should be rejected.

Public disclosures can, under certain circumstances, fall within the scope of the qualified privilege,[6] but the privilege is not absolute and will be lost if it is abused (as Plaintiff alleges it has been here).   For example, in *Fischkoff v. Iovance Biotherapeutics, Inc.* – a case with very similar facts to this one – the Southern District of New York held that statements in a corporation's 10-Q and 10-K filings that its chief medical officer had been terminated for cause were not protected by absolute privilege, which only applies in judicial or quasi-judicial contexts.   *See* 339 F. Supp. 3d at 388-89.   Although *Fischkoff* is under New York law, the court's holding accords with longstanding Delaware law regarding the distinction between the absolute privilege that applies in judicial or legislative proceedings, and "conditional or qualified privilege[s]" which may be applicable in other contexts but are rebuttable with evidence of abuse.   *See Pierce*, 185 A.2d at 479; *McLeod*, 2015 WL 853334, at *4.   Given the facts alleged in the Amended Complaint, the Company is not insulated from liability for defamation by the fact that the defamatory statements at issue were made in public disclosures.

Even assuming *arguendo* that the affirmative defense of qualified privilege is available to the Company, the Amended Complaint alleges facts which, accepted as true, demonstrate the abuse of any such privilege.   *Pierce*, 185 A.2d at 479; *McLeod*, 2015 WL 853334, at *4.   As discussed at length above, Plaintiff alleges that the Company knew that Cause did not actually exist when it represented otherwise to the public.   *See supra* Section V.A.1.   Knowingly false

---

[6]     *See, e.g.*, *Hampshire Group, Ltd. v. Kuttner*, 2010 WL 2739995, at *50 (Del. Ch. July 12, 2010) (applying South Carolina law).   The Company relies heavily on *Hampshire Group* for its argument that dismissal of Plaintiff's defamation claim under Rule 12(b)(6) is appropriate. However, *Hampshire Group* is a post-trial opinion, in which the court determined – "[w]ith the benefit of the full factual context provided at trial" – that the statements made in press releases and related SEC filings were true and were privileged due to lack of evidence of malice.   *Id.* at *49-50.   *Hampshire Group* does not stand for the proposition that dismissal based on qualified privilege is appropriate under Rule 12(b)(6) even where the plaintiff has sufficiently pled falsity and abuse of the privilege.   Rather, *Hampshire Group* illustrates that the defenses raised by the Company require factual determinations that cannot be resolved at the pleading stage.

statements are not protected by privilege.  *See Wooleyhan*, 2011 WL 1875710, at *23 ("A conditional privilege may be lost if it is abused by making a statement which the speaker knows is false.").

The Amended Complaint further alleges that the Company's false representations to the public were made with actual malice.  *See* Am. Compl., ¶ 187.  This allegation is not merely a "bald assertion" as the Company contends.  *See* Motion, ¶ 11.  Rather, it is supported by detailed factual allegations concerning the retaliatory effort by the Company and its agents to remove Plaintiff from his role as CMO – which effort included, among other things, misrepresentations by the CEO to the Board regarding Plaintiff's conduct and misrepresentations by the Chairman to another Board member regarding the nature of the July 25, 2019 Board meeting.  *See* Am. Compl., ¶¶ 72, 78, 121, 151, 168-69.  The Company's announcements regarding Plaintiff's "termination for cause" (the clear import of which is that he engaged in conduct constituting Cause) were made following this unlawful scheme and with knowledge that Cause did not actually exist.  The Amended Complaint thus alleges a malicious course of conduct undertaken for retaliatory purposes and motived primarily by ill will towards Plaintiff.  *See Pierce*, 185 A.2d at 480 (privilege may be forfeited if "statements complained of are made maliciously, that is, with actual ill will toward the object of the statement, or with an improper motive by the person making the statement").

These allegations raise questions of fact, which must be resolved by the factfinder, regarding whether the Company abused (and thus forfeited) any qualified privilege it may have had in connection with the July 26 Press Release, July 26 8-K, and August 21 14A.  *See Gonzalez v. Avon Prods., Inc.*, 609 F. Supp. 1555, 1559 (D. Del. 1985) (questions regarding abuse of privilege "involve some inquiry into the mind of the publisher" and thus have been

"traditionally reserved . . . for jury consideration"); *Stiner*, 243 F. Supp. 2d at 116 (denying motion to dismiss defamation claim because plaintiff's allegations raised questions of fact regarding whether qualified privilege had been abused).

The only instance in which dismissal based on an affirmative defense may be appropriate is if the defense's availability is "definitively ascertainable" on the face of the pleadings and can be established with "certitude." *Moretti v. Hertz Corp.*, 2017 WL 1032783, at *3 (D. Del. Mar. 17, 2017). Here, the Company's qualified privilege defense is not definitively ascertainable on the face of the pleadings and cannot be established with certitude – rather, it is based on disputed facts regarding falsity and malice, which are alleged at length in the Amended Complaint and must be accepted as true at this stage. The Company's motion to dismiss Plaintiff's defamation claim should be denied.

### B.      The Amended Complaint States a Claim Under the Pennsylvania WPCL

The WPCL (43 P.S. § 260.1, *et seq.*) "establishes a statutory vehicle to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement," and also provides for liquidated damages in certain circumstances and the award of attorneys' fees. *Andrews v. Cross Atl. Capital Partners, Inc.*, 158 A.3d 123, 133 (Pa. Super. 2017); *see also* 43 P.S. §§ 260.3, 260.9a, 260.10. "Employer" is defined under the WPCL as "includ[ing] every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in th[e] Commonwealth [of Pennsylvania]. 43 P.S. § 260.2a. "Employee" is not a defined term under the WPCL, but courts typically examine whether the employee is "based in Pennsylvania," as well as the terms of the relevant employment agreement (such as choice of law or forum selection clauses) and, in the case of nonresidents, the extent of

work performed in Pennsylvania.  *See McGoldrick v. TruePosition, Inc.*, 623 F. Supp. 2d 619, 629, 631-32 (E.D. Pa. 2009).

The Company argues that Plaintiff cannot bring a claim under the WPCL because, by the time his employment was terminated, he had moved to Florida.  This argument is without merit for several reasons.  First, Section 2.5 of the Employment Agreement expressly provides that the "principal place of business" for the performance of Plaintiff's duties is Wynnewood, Pennsylvania.   Second, even after moving to Florida in March 2019, Plaintiff was still responsible for directing and leading the oncology research activities being carried out at the Company's Pennsylvania-based laboratory.   Third, further questions concerning the impact of Plaintiff's move to Florida on his ability to bring a claim under the WPCL require factual determinations not appropriate at the pleading stage.

Section 2.5 of the Employment Agreement provides, in relevant part: "The Executive's principal place of business for the performance of his duties under this Agreement shall be in Wynnewood, Pennsylvania."  Am. Compl., ¶ 210; *id.*, Ex. A, Employment Agreement, § 2.5.[7] Wynnewood, Pennsylvania is the location of the Company's oncology research laboratory, which was acquired from ProstaGene in November 2018 and operated "under the guidance of Dr. Pestell."  *See id.*, ¶¶ 1, 81-83.[8]  Plaintiff lived in Pennsylvania at the time the Employment Agreement was executed, but moved to Fort Lauderdale, Florida in March 2019 after the

---

[7]     The Employment Agreement contains a Delaware choice of law and forum selection clause.  *See* Am. Compl., Ex. A, Employment Agreement, § 5.6.  For this reason, Plaintiff's original Complaint asserted his wage payment claim under Delaware's Wage Payment & Collection Act.  CytoDyn – joined by the Individual Defendants – moved to dismiss, arguing that the Delaware statute was inapplicable.  *See* D.I. 11; D.I. 14.  In response, Plaintiff chose to amend his pleading to assert a claim under Pennsylvania's WPCL instead, due to Section 2.5 of the Employment Agreement and Plaintiff's performance of duties in Pennsylvania.

[8]     In addition, the oncology laboratory was administered, pursuant to a Master Sponsored Research Agreement, by Blumberg, which is based in Doylestown, Pennsylvania.  *See* Am. Compl., ¶ 85.

Company opened an additional office there. *Id.*, ¶¶ 69, 210. Even after relocating his personal residence to Florida, Plaintiff still had "direct responsibility" for the Company's oncology research and development program, which continued to be carried out in the Company's oncology research laboratory in Pennsylvania. *Id.*, ¶ 83; *see also id.*, ¶¶ 84, 86 (summarizing the laboratory's activities in the period immediately preceding Plaintiff's termination).

The Company nonetheless argues that the only relevant fact for purposes of its Motion is that Plaintiff had relocated his personal residence to Florida by the time the Separation Obligations were "triggered." Motion, ¶ 19.[9] That is a flawed premise. The parties plainly considered Plaintiff a Pennsylvania employee at the time they entered into the Employment Agreement (as demonstrated by Section 2.5), and although he subsequently moved to Florida, his responsibilities as CMO – which included authority over oncology research activities being conducted at the Pennsylvania laboratory – did not change when he moved. "[P]laintiff's residence and citizenship alone do not defeat his claim under the WPCL. . . . [S]omething less than full-time in-state employment can trigger the WPCL's protections." *Eastland v. Du Pont*, 1996 WL 421940, at *5 (E.D. Pa. July 23, 1996). Unlike cases cited by the Company where the plaintiff-employee had *no* connection to Pennsylvania,[10] here the Employment Agreement establishes Pennsylvania as the principal place of business, Plaintiff indisputably lived and worked in Pennsylvania when the employment relationship commenced, and Plaintiff continued to have responsibilities in Pennsylvania throughout the entirety of the employment relationship.

---

[9]    Plaintiff's WPCL claim does not relate solely to the Separation Obligations, as the Company states in its Motion (¶ 19). Count Two also relates to the improper contingencies which were placed on the payment of Plaintiff's annual bonus. *See* Am. Compl., ¶¶ 219-22.

[10]    *See, e.g.*, *Killian v. McCulloch*, 873 F. Supp. 938, 941-42 (E.D. Pa. 1995), *aff'd sub nom.*, *Stadler v. McCulloch*, 82 F.3d 406 (Table) (3d Cir. 1996) (plaintiffs were "*never* based in" and did not reside in Pennsylvania) (emphasis added); *Hides v. CertainTeed Corp.*, 1995 WL 458786, at *2 (E.D. Pa. July 26, 1995) (plaintiff did not allege he worked in Pennsylvania).

These allegations are more than sufficient to allege Plaintiff's "employee" status under the WPCL. *See, e.g.*, *Jesse v. Sphinx Systemhouse, Inc.*, 2011 WL 5865491, at *3 (N.D. Ill. Nov. 17, 2011) (provision in employment agreement stating that employee would "render" his employment duties in Downingtown, Pennsylvania sufficiently sustained claim under WPCL). To the extent the Company disputes these facts,[11] those disputes do not provide a basis for dismissal under Rule 12(b)(6). *See Eastland*, 1996 WL 421940, at *5 (questions concerning extent of employee's work contacts in Pennsylvania could "be revisited when the record is more fully developed," but were not a proper basis for dismissal). In particular, determining the implications of Plaintiff's move to Florida on his ability to bring a claim under the WPCL requires factual determinations beyond the scope of the Rule 12(b)(6) analysis. This is not a scenario where Plaintiff alleges no connection to Pennsylvania; rather, the terms of the Employment Agreement, the location of the oncology research laboratory, and Plaintiff's responsibilities as CMO over oncology research activities all implicate Pennsylvania. The Court should accordingly deny the Company's motion to dismiss Plaintiff's WPCL claim.

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.

---

[11]     *See, e.g.*, Motion, ¶ 22 n.27.  The Company's commentary in footnote 27 of the Motion concerning the purported reason for Plaintiff's relocation to Florida is irrelevant to Plaintiff's WPCL claim or to the resolution of the Company's Motion.

Respectfully submitted,

Dated: November 8, 2019

/s/ Michael C. Hochman
Michael C. Hochman (DE No. 4265)
Monzack Mersky McLaughlin and Browder, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE 19801
Tel: (302) 656-8162
Fax: (302) 656-2769
mhochman@monlaw.com

-and-

Steven M. Coren (admitted *pro hac vice*)
Benjamin M. Mather (admitted *pro hac vice*)
Janice I. Daul (admitted *pro hac vice*)
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
bmather@kcr-law.com
jdaul@kcr-law.com

*Counsel for Plaintiff*
*Richard G. Pestell, M.D., Ph.D*