## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RICHARD G. PESTELL, M.D., PH.D.,

Plaintiff,

v.

CYTODYN INC.; CYTODYN OPERATIONS
INC.; NADER Z. POURHASSAN, PH.D.;
AND SCOTT A. KELLY, M.D.,

Defendants.

Civil Action No. 1:19-cv-01563-RGA

## PLAINTIFF'S OPPOSITION TO DEFENDANTS
## POURHASSAN AND KELLY'S MOTION TO DISMISS

KAUFMAN, COREN & RESS, P.C.
Steven M. Coren, Esq.
Benjamin M. Mather, Esq.
Janice I. Daul, Esq.
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
bmather@kcr-law.com
jdaul@kcr-law.com
Admitted *Pro Hac Vice*

MONZACK MERSKY MCLAUGHLIN AND
BROWDER, P.A.
Michael C. Hochman (DE No. 4265)
1201 N. Orange Street, Suite 400
Wilmington, DE 19801
Tel: (302) 656-8162
Fax: (302) 656-2769
mhochman@monlaw.com

*Attorneys for Plaintiff*
*Richard G. Pestell, M.D., Ph.D.*

Dated:  November 8, 2019

# TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDING ................................................................1

II.    INTRODUCTION .................................................................................................................1

III.    FACTUAL BACKGROUND ...............................................................................................3

    A.  The ProstaGene Acquisition ....................................................................................3

    B.  The Employment Agreement ...................................................................................4

    C.  Deterioration of the Relationship Between Dr. Pestell and the Company ................7

    D.  Termination of Dr. Pestell's Employment ...............................................................8

IV.    STANDARD OF REVIEW ...............................................................................................11

V.    ARGUMENT ......................................................................................................................12

    A.  The Individual Defendants Are Proper Parties Over Whom the Court May Exercise Personal Jurisdiction Pursuant to 10 Del. C. § 3114 ...................................12

    B.  The Exercise of Personal Jurisdiction Over the Individual Defendants Is Consistent With Constitutional Expectations of Due Process ..................................16

VI. CONCLUSION ..................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. Cross Atl. Capital Partners, Inc.*, 158 A.3d 123 (Pa. Super. 2017)........................... 18

*Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal.*, 480 U.S. 102 (1987)..................................... 16

*Cook Techs., Inc. v. Panzarella*, 2018 WL 6616932 (E.D. Pa. Dec. 18, 2018)........................... 14

*Del. Prof'l Ins. Co. v. Hajjar*, 55 F. Supp. 3d 537 (D. Del. 2014) ............................................. 16

*Deutsch v. ZST Digital Networks, Inc.*, 2018 WL 3005822 (Del. Ch. June 14, 2018)................. 16

*Graphics Props. Holdings, Inc. v. ASUS Comp. Int'l*, 70 F. Supp. 3d 654 (D. Del. 2014).......... 11

*Hazout v. Tsang Mun Ting*, 134 A.3d 274 (Del. 2016) ......................................................*passim*

*HMG/Courtland Props., Inc. v. Gray*, 729 A.2d 300 (Del. Ch. 1999) ........................................ 16

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) .................................................................. 12

*Intel Corp. v. Broadcom Corp.*, 167 F. Supp. 2d 692 (D. Del. 2001) ......................................... 16

*LVI Group Invs., LLC v. NCM Group Holdings, LLC*, 2018 WL 1559936
    (Del. Ch. Mar. 28, 2018)...................................................................................................... 14

*Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324 (3d Cir. 2009)........................................... 11

*Mohney v. McClure*, 568 A.2d 682 (Pa. Super. 1990), *aff'd*, 604 A.2d 1021 (Pa. 1992)............. 14

*O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312 (3d Cir. 2007)...................................... 11

*PATS Aircraft, LLC v. Vedder Munich GmbH*, 197 F. Supp. 3d 663 (D. Del. 2016)............. 11, 12

*Turf Nation, Inc. v. UBU Sports, Inc.*, 2017 WL 4535970 (Del. Super. Oct. 11, 2017).............. 18

*Wiggins v. Physiologic Assessments Servs., LLC*, 138 A.3d 1160 (Del. Super. 2016) ............... 18

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)............................................. 16

**Statutes**

10 *Del. C.* § 3104 ...................................................................................................................... 11

10 *Del. C.* § 3114 ...............................................................................................................*passim*

**Rules**

Federal Rule of Civil Procedure 4(k)(1)(A) ............................................................................... 11

Federal Rule of Civil Procedure 12(b)(2) .............................................................................. 1, 11

Federal Rule of Civil Procedure 15(a)(1)(B) ............................................................................... 1

**Other Authorities**

59 Am. Jur. 2d *Parties* § 8 ........................................................................................................ 13

Plaintiff Richard G. Pestell, M.D., Ph.D. ("Plaintiff" or "Dr. Pestell"), by and through his undersigned counsel, submits this memorandum of law in opposition to the Motion to Dismiss (D.I. 18) (the "Motion") filed by Defendants Nader Z. Pourhassan, Ph.D. ("Dr. Pourhassan" or the "CEO") and Scott A. Kelly, M.D. ("Dr. Kelly" or the "Chairman") (collectively, the "Individual Defendants").

## I.     NATURE AND STAGE OF THE PROCEEDING

Plaintiff commenced this suit on August 22, 2019 by filing the Complaint against CytoDyn Inc., CytoDyn Operations Inc.,[1] Dr. Pourhassan, and Dr. Kelly.  CytoDyn moved to partially dismiss the Complaint, which the Individual Defendants joined.  *See* D.I. 11 and D.I. 14.  Thereafter, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff filed the First Amended Complaint.  *See* D.I. 15 (the "Amended Complaint" or "Am. Compl.").  The Amended Complaint asserts a claim for violation of the Pennsylvania Wage Payment and Collection Law (the "WPCL") against the Individual Defendants.[2]  The Individual Defendants filed a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2),[3] to which Plaintiff objects and responds herein.

## II.     INTRODUCTION

Dr. Pestell joined CytoDyn in November 2018 as a member of its Board of Directors (the "Board") and as its Chief Medical Officer ("CMO"), pursuant to the terms of an Employment

---

[1]     CytoDyn Inc. and CytoDyn Operations Inc. are referred to herein, collectively, as "CytoDyn" or the "Company."

[2]     The Amended Complaint also asserts claims for breach of contract, violation of the WPCL, and defamation against CytoDyn, as well as a claim for declaratory relief.

[3]     The Individual Defendants also "incorporate by reference and join" the dismissal arguments made by CytoDyn relating to the WPCL claim, pursuant to Rule 12(b)(6). Motion, ¶ 13; *see also* CytoDyn's Partial Motion to Dismiss the Amended Complaint, D.I. 17 (seeking, *inter alia*, dismissal of the WPCL claim for failure to state a claim).  Those arguments are without merit for the reasons set forth in Plaintiff's opposition to CytoDyn's motion to dismiss, which is filed contemporaneously herewith and incorporated herein by reference.

Agreement (the "Employment Agreement") dated November 16, 2018.   On July 25, 2019 – following retaliatory efforts to strip him of his authority as CMO and interfere with his ability to perform his duties – the Company terminated Plaintiff's employment.   As a pretext for firing him, the Company asserted the existence of "Cause" (which is narrowly defined in the Employment Agreement), even though it knew that Cause did not actually exist.   Dr. Pestell's Amended Complaint seeks to recover what he is owed (including severance) under the WPCL from the Company and the Individual Defendants.

Dr. Pourhassan (a citizen of Washington) and Dr. Kelly (a citizen of Georgia) argue that this Court does not have personal jurisdiction over them because they lack sufficient contacts with Delaware.   The Motion should be denied because this Court has personal jurisdiction over the Individual Defendants pursuant to Section 3114 of Title 10 of the Delaware Code.

Under Section 3114, directors and officers such as the Individual Defendants, by virtue of accepting and holding their position, consent to jurisdiction in Delaware in civil actions against the corporation in which the director or officer is a necessary or proper party.   The Individual Defendants are proper parties to this action because they have a tangible legal interest in the dispute that is separate from the Company's (since they may be held personally liable as the Company's agent and/or officer under the WPCL) and because Dr. Pestell's claim against them arises out of the same facts and occurrences as the claims against the Company.   The exercise of jurisdiction also comports with constitutional requirements of due process because the Individual Defendants purposefully availed themselves of the benefits and protections of Delaware law by accepting their respective roles with the Company (a Delaware corporation), in which capacity they took the actions upon which Dr. Pestell's claim is based.   Further, the Employment Agreement contains a Delaware forum selection clause, such that the Individual Defendants

could reasonably foresee and anticipate being subject to litigation in Delaware for wrongdoing in connection with Dr. Pestell's termination.

## III.     FACTUAL BACKGROUND

### A.     The ProstaGene Acquisition

CytoDyn is a publicly-traded biotechnology company focused on the clinical development of Leronlimab (also known as PRO 140) for the treatment and prevention of HIV infection and, more recently, for the treatment of cancer and certain inflammatory diseases. Am. Compl., ¶¶ 1, 33-34. CytoDyn Inc. and CytoDyn Operations Inc. are both incorporated in Delaware but maintain their principal place of business in Washington. *Id.*, ¶¶ 7-8; Declaration of Janice I. Daul, Esq. ("Daul Decl."), Ex. A (reflecting that CytoDyn Inc. is a Delaware corporation in good standing); *id.*, Ex. B (same, with respect to CytoDyn Operations Inc.).[4] Dr. Pourhassan is the President and CEO of CytoDyn, as well as a member of CytoDyn's Board. Am. Compl., ¶ 9; Daul Decl., Ex. C, p. 4; *id.*, Ex. D, p. 2. Dr. Kelly is a member of the Board, of which he has served as Chairman since December 2018. Am. Compl., ¶ 10; Daul Decl., Ex. C, p. 4; *id.*, Ex. D, p. 1. Dr. Kelly was also appointed as CytoDyn's Chief Science Officer in July 2019. Am. Compl., ¶ 10.

As part of CytoDyn's effort to expand its clinical focus into the areas of cancer and immunological conditions, in 2018 it acquired substantially all of the assets and rights, and assumed certain obligations and liabilities, of ProstaGene, LLC ("ProstaGene"), a privately held biotechnology start-up founded in 2011 by Dr. Pestell and based in the Philadelphia area. *Id.*, ¶¶ 1, 30, 34-35. The terms of the transaction are set forth in the Transaction Agreement, dated August 27, 2018, between CytoDyn Inc., Point NewCo, Inc., Point Merger Corp., ProstaGene,

---

[4]     *See also* Daul Decl., Ex. C, pp. 1-2 (describing corporate structure following CytoDyn's acquisition of ProstaGene).

and Dr. Pestell. *Id.*, ¶ 35; Daul Decl., Ex. F, Transaction Agreement. CytoDyn's Chief Financial Officer, Michael Mulholland (the "CFO"), signed the Transaction Agreement on behalf of the Company, though the signature pages include signature blocks for Dr. Pourhassan, indicating that the parties at some point expected him to sign the agreement on behalf of the Company. Am. Compl., ¶ 38.

Closing on the transaction occurred on November 16, 2018 (the "Closing"). *Id.*, ¶ 39. The assets CytoDyn acquired from ProstaGene consisted primarily of intellectual property and intellectual property rights, as well as control over ProstaGene's cancer research laboratory, which operated "under the guidance of Dr. Pestell" and was administered through the Baruch S. Blumberg Institute ("Blumberg") located in Doylestown, Pennsylvania. *Id.*, ¶¶ 40, 81-82, 85. As consideration for these assets, CytoDyn issued 27,000,000 common shares (the "Acquisition Shares") to ProstaGene. *Id.*, ¶ 40.

## B.     The Employment Agreement

As a condition to Closing on the ProstaGene acquisition, CytoDyn agreed to employ Dr. Pestell as its CMO and appoint him to CytoDyn's Board. *Id.*, ¶ 36. On November 16, 2018, CytoDyn and Dr. Pestell entered into the Employment Agreement, which set forth the terms and conditions of Dr. Pestell's employment relationship with CytoDyn. *Id.*, ¶ 52; *see also* Daul Decl., Ex. E, Employment Agreement.[5] The CFO signed the Employment Agreement on behalf of CytoDyn, though the signature pages include a signature block for Dr. Pourhassan. Am. Compl., ¶ 53. The Employment Agreement contains a Delaware forum selection clause. *Id.*, ¶ 20; Daul Decl., Ex. E, Employment Agreement, § 5.6.

Section 1.2 of the Employment Agreement provided for a 3-year term of employment.

---

[5]     The Employment Agreement is also attached to the Amended Complaint as Exhibit A.

Am. Compl., ¶ 55. Dr. Pestell's initial base salary was $400,000 per year, which was increased to $600,000 per year in February 2019. *Id.*, ¶¶ 56-57. Dr. Pestell was also eligible to receive an "Annual Bonus," which had a target amount of 50% of his base salary and would be determined by the Board and/or the Compensation Committee, and a "Supplemental Bonus," which would be determined in the "sole discretion" of the Board. *Id.*, ¶ 58.[6]

Section 2.2 of the Employment Agreement set forth the scope of Dr. Pestell's duties and responsibilities as CMO, which included, *inter alia*, having "direct responsibility for providing direction and leadership for the Company's pipeline and development programs in oncology and immunology for PRO 140" and being "actively engaged in assisting to define the overall business strategy and direction for the Company's clinical development plans, including strategic development and implementation of clinical programs, collaboration with strategic partners and further exploration of new and existing patent protection for PRO 140." *Id.*, ¶ 54. Section 2.5 of the Employment Agreement provides that "[t]he Executive's principal place of business for the performance of his duties under th[e] [Employment] Agreement shall be in Wynnewood, Pennsylvania." *Id.*, ¶ 210. In March 2019, Dr. Pestell relocated to Fort Lauderdale, Florida, after the Company opened an office there. *Id.*, ¶ 69.

Article 4 of the Employment Agreement sets forth the provisions governing termination of Dr. Pestell's employment with the Company, including circumstances in which the Company could terminate his employment for "Cause" and in which Dr. Pestell could resign from the Company for "Good Reason." *Id.*, ¶¶ 59-60, 66. "Cause," as defined in the Employment

---

[6] In June 2019, the Company improperly attempted to impose additional contingencies on the award of Dr. Pestell's bonus. On June 19, 2019, the CEO emailed Dr. Pestell telling him that his bonus had been "approved and evaluated by [the] compensation committee" but would be paid out "50% after the first $15 million raised. 50% after second $15 million." Am. Compl., ¶ 155. The Employment Agreement, however, does not provide for any such holdback pending further fundraising. *Id.*, ¶¶ 156, 219.

Agreement, includes (i) fraud or other acts intended to enrich Plaintiff at the expense of the Company; (ii) conviction of a felony; (iii) willful, continued, and uncured failure to perform duties or obligations; or (iv) material violations of the Covenants Agreement.[7] *See id.*, ¶ 61.

"Good Reason," as defined in the Employment Agreements, includes, *inter alia*, a material breach of the Employment Agreement by the Company and a material diminution in Plaintiff's authority, duties, or responsibilities. *See id.*, ¶ 62. Dr. Pestell "[could] resign for Good Reason provided he notifies the Company within ninety (90) days of the occurrence of any of the conditions that he reasonable [sic] considers to be a 'Good Reason' condition and provides the Company with at least thirty (30) days in which to cure the condition," in accordance with Section 4.1(a) of the Employment Agreement. *Id.*, ¶ 60.

If the Company terminated Dr. Pestell's employment without Cause or if Dr. Pestell resigned for Good Reason, then Dr. Pestell was entitled to receive, *inter alia*, "continued payment of [his] then-current Base Salary for the longer of (x) the remainder of the Basic Term and (y) twelve (12) months," as well as payment of any Annual or Supplemental Bonus payable but not yet paid and a pro-rata bonus for the fiscal year in which the cessation of his employment occurred. *Id.*, ¶ 63. Dr. Pestell's stock options would also vest and become exercisable. *See id.*, ¶ 64. In addition, stock restrictions on 8,342,000 of Dr. Pestell's shares would "automatically lapse." *Id.*, ¶¶ 43, 65; *see also* Daul Decl., Ex. G, Stock Restriction Agreement.[8]

Section 4.2 of the Employment Agreement addresses termination for Cause and voluntary resignation. *See* Am. Compl., ¶ 66. In such event, the Executive shall only receive the "Accrued

---

[7]     The terms "Covenants Agreement" refers to the Confidential Information, Inventions and Noncompetition Agreement entered into on November 16, 2018 between Dr. Pestell and the Company. *See* Daul Decl., Ex. H.
[8]     The Stock Restriction Agreement is also attached to the Amended Complaint as Exhibit B.

Obligations," which consist of accrued but unpaid salary, vacation, reimbursements, and vested benefits. *Id.*

### C.     Deterioration of the Relationship Between Dr. Pestell and the Company

Although Dr. Pestell and the Company initially enjoyed a good relationship, his relationship with the CEO rapidly deteriorated following Dr. Pestell's objections in late June 2019 to the CEO relating to the submission of an investigational new drug application and protocol to the FDA. *Id.*, ¶¶ 70, 72-77. Following this dispute, the CEO embarked on an effort to retaliate against Dr. Pestell by obstructing his ability to carry out his responsibilities, relieving him of his authority over various matters, and ultimately leading the effort to terminate his employment. *Id.*, ¶ 78.

Indeed, beginning in June 2019, the Company, often acting through the CEO, inhibited and obstructed Dr. Pestell's performance of his duties as CMO at every turn, including by:

- failing to support or fund the Company's oncology research laboratory and preclinical activities, which were essential for the development of oncology and cancer metastasis research programs under Dr. Pestell's authority (*see id.*, ¶¶ 80, 83, 86-99, 141-46);

- prohibiting Dr. Pestell from communicating with employees and others with whom he needed to interact to properly and effectively perform his duties as CMO (*see id.*, ¶¶ 104-17);

- excluding Dr. Pestell from important decisions, meetings, and public interviews regarding matters within his purview as CMO (*see id.*, ¶¶ 88-89, 98, 133-40); and

- appointing the Chairman as "Chief Science Officer" and assigning him numerous responsibilities which were already under the authority of and being performed by

Dr. Pestell as the CMO (*see id.*, ¶¶ 120, 125-31).

On July 1, 2019, the CEO sent an email to the members of Board (other than Dr. Pestell) seeking "board permission to terminate Dr. Pestell's employment agreement with CytoDyn 'for cause'" (the "July 1 Email"). *Id.*, ¶ 119[9]; Daul. Decl., Ex. I, July 1 Email. As supposed support for his attempt to fire Dr. Pestell, the CEO made a series of spurious accusations regarding Dr. Pestell's conduct, including that Dr. Pestell was uncooperative, had misrepresented information regarding programs and patents, and failed to respond to communications and requests. *Id.*; Am. Compl., ¶ 120. These accusations are false and, in any event, insufficient as a matter of law to constitute "Cause" under the terms of the Employment Agreement. *Id.*, ¶¶ 121-22. Board member Carl Dockery pushed back on this improper attempt to fire Dr. Pestell and recommended that a fair, independent, and impartial investigation be conducted regarding the CEO's accusations, but no such investigation was ever performed. *Id.*, ¶¶ 123-24.

**D.    Termination of Dr. Pestell's Employment**

On July 22, 2019, Dr. Pestell, through his counsel, sent a letter to the Company (the "Notice Letter") in accordance with Section 4.1 of the Employment Agreement, which notified the Company that its conduct in obstructing his ability to perform his duties as CMO constituted a breach of the Employment Agreement and had the effect of materially diminishing his authority, duties, and responsibilities, such that Good Reason existed for his resignation. *Id.*, ¶¶ 157, 159-60 and Notice Letter attached as Exhibit C to the Amended Complaint.

A Board meeting had been scheduled for July 23, 2019 but was postponed following the Company's receipt of the Notice Letter and of another letter (also dated July 22, 2019) from Mr.

---

[9]    The CEO, in the July 1 Email, also proposed naming the Chairman as the interim CMO. When that plan fizzled, he proposed a new plan to appoint the Chairman to the newly-created Chief Science Officer position, the scope of work for which included many of the CMO's responsibilities. Am. Compl., ¶¶ 120, 125-26, 130.

Dockery.[10]  Am. Compl., ¶ 164.  The meeting was rescheduled to July 25, 2019 at 9:15 pm EST and held via conference call.  *Id.*, ¶ 165.  In advance of the call, the CFO distributed a meeting agenda to the Board which listed 4 topics relating to the management of the Company which would be presented for approval and/or discussion by the Board, as well as a fifth topic entitled only "Executive session," with no further explanation.  *Id.*, ¶ 166.

Dr. Pestell, the CEO, the Chairman, and all of the other Board members except Gregory Gould participated in the meeting.  *Id.*, ¶ 167.  Mr. Gould was unable to attend because he was on a plane at the time.  *Id.*, ¶ 168.  Upon information and belief, the CEO and the Chairman purposefully scheduled the call at a time when Mr. Gould could not attend because they knew that he would oppose the termination of Dr. Pestell's employment.  *Id.*, ¶¶ 168-69.  Prior to the meeting, the Chairman falsely told Mr. Gould that nothing unusual would occur during the call.  *Id.*, ¶ 168.  And, despite reviewing the other four agenda items with Mr. Gould (one of which concerned the formation of a special committee to investigate issues raised in the Notice Letter), the Chairman did not tell him that Dr. Pestell's termination would be discussed.  *Id.*

The July 25, 2019 Board call began with discussion of the other topics on the agenda, after which Dr. Pestell was asked to leave the line so the remaining Board members could have the "Executive session" closed discussion.  *Id.*, ¶ 170.  Approximately 15 minutes later, the Chairman sent a message asking Dr. Pestell to call him.  *Id.*, ¶ 171.  Shortly thereafter, at 11:07 pm EST, Dr. Pestell received an email from the Chairman advising Dr. Pestell that "the Board of Directors of CytoDyn has decided to terminate your employment for cause.  Please refer to the

---

[10]  Mr. Dockery's letter to the Board highlighted several other issues which he felt warranted the Board's attention, including concerns relating to the CEO's conduct, the Company's ability to raise capital, and recent efforts to remove Mr. Dockery from the Board.  Am. Compl., ¶ 163.

attached letter." (the "Termination Letter").  *Id.*, ¶ 172; Daul Decl., Ex. J, Termination Letter.[11]

As supposed justification for Dr. Pestell's "for cause" firing, the Termination Letter states that

"Among other reasons, the Board has determined you willfully and continuously have failed to

perform the duties or obligations reasonably assigned to you by the Board from time to time, and

that such willful and continued failure is not susceptible to cure, as determined in the sole

judgment and discretion of the Board."  *Id.*; Am Compl., ¶¶ 172-73.  The Termination Letter

contains no further explanation or identification of any "willful or continued failure" or other

conduct purportedly constituting Cause.  *Id.*  The Company's assertion of Cause is baseless and

pretextual.  *Id.*, ¶ 174.

On the morning of July 26, 2019, the day after terminating Dr. Pestell's employment, the

Company issued a press release (the "July 26 Press Release"), which includes the statement that

the Board had "terminated the employment of Dr. Richard G. Pestell, the Company's Chief

Medical Officer, for cause pursuant to the terms of his employment agreement with the

Company."  *Id.*, ¶¶ 181-82.  The same day, the Company also filed a Form 8-K (the "July 26 8-

K") with the Securities and Exchange Commission (the "SEC") stating that Dr. Pestell had been

"terminated . . . for cause pursuant to the terms of his employment agreement."  *Id.*, ¶ 183.  The

Company's Schedule 14A Proxy Statement filed with the SEC on August 21, 2019 (the "August

21 14A") again represented that Dr. Pestell's termination had been "for cause."  *Id.*, ¶ 185.

However, Dr. Pestell had not actually engaged in conduct constituting Cause for his termination,

and the Company's assertions otherwise in the Termination Letter and in subsequent public

announcements were knowingly false.  *Id.*, ¶¶ 4, 174-75, 186.

## IV.    STANDARD OF REVIEW

---

[11]     As a result of his termination, Dr. Pestell was also deemed to resign from the Board,
pursuant to Section 4.6 of the Employment Agreement.  Am. Compl., ¶ 179.

"When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor." *PATS Aircraft, LLC v. Vedder Munich GmbH*, 197 F. Supp. 3d 663, 670 (D. Del. 2016).   Once a jurisdictional defense has been raised, the plaintiff must establish, with reasonable particularity, that personal jurisdiction over the defendant is proper, typically through "sworn affidavits or other competent evidence." *Id.*   When the court has not conducted an evidentiary hearing, however, the plaintiff "need only establish a prima facie case of personal jurisdiction." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (*quoting O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007)).

The personal jurisdiction analysis involves two inquiries – one statutory and one constitutional. *PATS Aircraft*, 197 F. Supp. 3d at 670.   First, the court must determine whether there is a statutory basis for jurisdiction under the law of the forum state. *Id.*; *see also* FED. R. CIV. P. 4(k)(1)(A) (authorizing the exercise of personal jurisdiction over a nonresident defendant to the extent permissible under the law of the state in which the district court sits).   Delaware's long-arm statute, 10 *Del. C.* § 3104, sets forth bases upon which personal jurisdiction can be exercised over nonresidents and is "broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." *Graphics Props. Holdings, Inc. v. ASUS Comp. Int'l*, 70 F. Supp. 3d 654, 661 (D. Del. 2014).   Additionally, pursuant to Section 3114 of Title 10 of the Delaware Code,[12] a nonresident director or officer of a Delaware corporation, by virtue of accepting such election or appointment, consents to the exercise of personal jurisdiction over him in Delaware in two categories of cases: (1) "all civil actions or proceedings brought in

---

[12]     Section 3114 is an extension of Delaware's long-arm statute. *See* 10 *Del. C.* § 3114(e) ("This section is an extension of and not a limitation upon the right otherwise existing of service of legal process upon nonresidents."); *see also* 10 *Del. C.* § 3104(k).

[Delaware], by or on behalf of, or against such corporation" in which the director or officer "is a necessary or proper party," or (2) "any action or proceeding" against the director or officer for "violation of a duty in such capacity." *See* 10 *Del. C.* § 3114(a) (applicable to directors); 10 *Del. C.* § 3114(b) (applicable to officers); *see also Hazout v. Tsang Mun Ting*, 134 A.3d 274, 277 (Del. 2016).[13]

Once the court determines that there is a statutory basis for the exercise of personal jurisdiction, the court must then determine whether such exercise is consistent with the constitutional requirements of due process. *See PATS Aircraft*, 197 F. Supp. 3d at 670; *Hazout*, 134 A.3d at 278, 292. Due process is satisfied when there are "minimum contacts" between the non-resident defendant and the forum state, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

## V.   ARGUMENT

### A.   The Individual Defendants Are Proper Parties Over Whom the Court May Exercise Personal Jurisdiction Pursuant to 10 *Del. C.* § 3114

The Individual Defendants are "proper" parties subject to personal jurisdiction in Delaware under Section 3114 because: (1) they have tangible legal interests in this dispute which are separate from CytoDyn's, and (2) Dr. Pestell's claims against them arise out of the same facts

---

[13]   Prior to *Hazout*, Delaware courts limited the application of Section 3114 to claims for breach of fiduciary duty, based on the Court of Chancery's holding in *Hana Ranch, Inc. v. Lent*, 424 A.2d 28 (Del. Ch. 1980), which effectively read the "necessary or proper party" language out of the statute. The Delaware Supreme Court, in *Hazout*, expressly rejected that approach, abrogating *Hana Ranch* and its progeny. *See Hazout*, 134 A.3d at 287 ("[W]e cannot embrace the approach taken by *Hana Ranch*. . . . [W]e cannot square it with what we understand to be our duty in giving effect to our General Assembly's enactments."). Section 3114, by its "plain language," applies not just to claims for breach of fiduciary duty, but also to actions in which the officer is a "necessary or proper party." *Id.* at 277, 292 (holding that officer was proper party to fraud, unjust enrichment, and fraudulent transfer claims).

and occurrences as the claims against CytoDyn, such that it serves judicial economy to consider those claims together. *See Hazout*, 134 A.3d at 278.   The Individual Defendants' arguments otherwise should be rejected.

Section 3114 deems nonresident directors and officers of Delaware corporations – such as the Individual Defendants[14] – to have consented to the exercise of personal jurisdiction in "all civil actions or proceedings brought in [Delaware] . . . against such corporation" if the director or officer "is a necessary or proper party" to the action. 10 *Del. C.* § 3114(a), (b).   As directors of the Company, the Individual Defendants fall within the ambit of Section 3114(a). *See* Am. Compl., ¶¶ 9-10, 18-19.   Dr. Pourhassan, as President and CEO, is also an officer of the Company within the ambit of Section 3114(b). *See id.*, ¶¶ 9, 18; *see also* 10 *Del. C.* § 3114(b)(1) (defining "officer" to include, among others, the president and the chief executive officer of the corporation).

For purposes of Section 3114, "proper" parties are those who "have a separable legal interest in the suit." *Hazout*, 134 A.3d at 277; *see also* 59 Am. Jur. 2d *Parties* § 8 ("A party is 'legally affected' by a cause of action, so as to be a proper party to the action, if the party has a legal interest in rights that are the subject matter of the cause of action.").[15]   Here, the Individual Defendants have tangible legal interests in this dispute that are separate from CytoDyn's because, under the WPCL, they may be held personally liable for their role in causing CytoDyn to violate the WPCL in connection with Dr. Pestell's wrongful termination and the withholding of his bonus. *See* 43 P.S. § 260.2a (defining "employer" to include "any agent or officer" of a

---

[14]    *See* Daul Decl., Exs. A and B (reflecting Delaware corporate status); *id.*, Ex. C, p. 4 and Ex. D (reflecting Individual Defendants' positions with the Company).

[15]    "Necessary" parties are those with rights "which must be ascertained and settled before the rights of the parties to the suit can be determined." *Hazout*, 134 A.3d at 289.   Dr. Pestell does not contend that the Individual Defendants are necessary parties.   As set forth above though, they *are* proper parties to this action.

corporate employer under the WPCL); *Mohney v. McClure*, 568 A.2d 682, 344-45 (Pa. Super. 1990), *aff'd*, 604 A.2d 1021 (Pa. 1992) (agents and officers may be held personally liable under the WPCL if they played an active role in decision-making); *Cook Techs., Inc. v. Panzarella*, 2018 WL 6616932, at *27, *29 (E.D. Pa. Dec. 18, 2018) (finding directors personally liable under WPCL as agents of the corporation); *see also* Am. Compl., ¶¶ 18-19, 209, 212. Given that Dr. Pestell's rights under the WPCL are at issue in this action and that the Individual Defendants may be held personally liable for violating those rights, the Individual Defendants have tangible legal interests in this dispute separate from the Company's, sufficient to render them proper parties within the meaning of Section 3114. *See LVI Group Invs., LLC v. NCM Group Holdings, LLC*, 2018 WL 1559936, at *9 (Del. Ch. Mar. 28, 2018) (holding that officers and directors were proper parties under Section 3114 because they were subject to personal liability for torts they participated in while acting in their official capacities).

In order to ensure that "the implied consent mechanism of § 3114 only applies when a director or officer faces claims that arise out of his exercise of his corporate powers," Section 3114 requires "a close nexus between the claims against the corporation and those against the officer and director." *Hazout*, 134 A.3d at 279. Here, Dr. Pestell's WPCL claims against the Individual Defendants arise out of the exact same facts and occurrences as his WPCL claims against the Company. *See* Am. Compl., ¶¶ 208-23. Further, the Individual Defendants were acting in their official capacities on behalf of the Company when they took the actions complained of in the Amended Complaint – which effectuated the wrongful termination of Dr. Pestell's employment (thereby denying him the Separation Obligations to which he is entitled). *See id.*, ¶ 212; *see also, e.g., id.*, ¶¶ 119-22 (CEO seeks to have Dr. Pestell terminated for Cause based on spurious and false accusations), ¶¶ 168-69 (Chairman misrepresents the nature of the

July 25, 2019 Board meeting to Gould), ¶ 172 (Chairman sends the Termination Letter to Dr. Pestell, which falsely asserts the existence of Cause for termination); *see also* Daul Decl., Ex. I, July 1 Email; *id.*, Ex. J, Termination Letter. As in *Hazout*, "because of these facts and the reality that all of [Individual Defendants'] actions relevant to the suit could not have been accomplished without the power of [their] offices in a Delaware corporation, there is no due process problem in exercising personal jurisdiction over [them]." 134 A.3d at 279.

By "authorizing jurisdiction over corporate fiduciaries who use their position to commit wrongs on behalf of the corporation in actions where the corporation is properly before the court," Section 3114 serves the interest of "conserving litigant and judicial resources by enabling plaintiffs to seek redress against the corporation and the fiduciary for injuries in one, rather than multiple forums, for claims arising out of the same facts or occurrences." *Hazout*, 134 A.3d at 290. Such interest would be served here by permitting Dr. Pestell to seek redress for his WPCL claims against all of the Defendants in this forum, rather than litigating against the Company in Delaware while simultaneously litigating the same claims against the Individual Defendants in one or more different forums.

Section 3114 thus provides a proper statutory basis for this Court to exercise personal jurisdiction over the Individual Defendants. *See id.* at 292 (holding that officer was "obviously a proper party" where he "ha[d] a tangible legal interest in the matter that [wa]s separate from [the company's] interest" and "the claims against him ar[o]se out of the same facts and occurrences as the claims against [the company] – alleged wrongs that [the officer] committed in his capacity as the company's President and CEO").

**B.      The Exercise of Personal Jurisdiction Over the Individual Defendants Is Consistent With Constitutional Expectations of Due Process**

Once it is determined that a statutory basis for personal jurisdiction exists, the Court must then apply the minimum contacts analysis set forth in *International Shoe* and its progeny to ensure that the exercise of jurisdiction comports with due process. *See Intel Corp. v. Broadcom Corp.*, 167 F. Supp. 2d 692, 705 (D. Del. 2001). Sufficient minimum contacts exist when a defendant has "purposefully avail[ed]" itself of the benefits and protections of the forum state's laws such that he can "reasonably foresee" being haled into court in the forum to answer for his conduct. *Id.* (*citing Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal.*, 480 U.S. 102, 109 (1987); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Dr. Pourhassan and Dr. Kelly "purposefully availed [themselves] of certain duties and protections under [Delaware] law" by becoming directors (and also, in the case of Dr. Pourhassan, an officer) of a Delaware corporation. *Deutsch v. ZST Digital Networks, Inc.*, 2018 WL 3005822, at *12 (Del. Ch. June 14, 2018) (*quoting Hazout*, 134 A.2d at 292); *see also Del. Prof'l Ins. Co. v. Hajjar*, 55 F. Supp. 3d 537, 542 (D. Del. 2014). Under Delaware law, Section 3114 constitutes "explicit notice" to officers and directors that, by accepting such positions, they "consent[] to appear in [Delaware] to defend claims that fall [within the ambit of Section 3114]." *Hazout*, 134 A.3d at 290; *see also HMG/Courtland Props., Inc. v. Gray*, 729 A.2d 300, 306 (Del. Ch. 1999) (Section 3114 "provides clear notice to any reasonably informed director that accepting service as a director of a Delaware corporation brings with it an obligation to defend official capacity suits here. This fact is the underpinning of § 3114's constitutionality.").

Further, the Employment Agreement contains a Delaware forum selection clause, which provides that "**[a]ny and all actions arising out of this [Employment] Agreement or Executive's employment by Company or termination therefrom shall be brought and**

**heard in the state and federal courts of the State of Delaware** and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of any such courts." *See* Daul Decl., Ex. E, Employment Agreement, § 5.6 *(emphasis added)*.  Likewise, the Transaction Agreement, Stock Restriction Agreement, and Covenants Agreement also contain Delaware forum selection and/or choice of law clauses. *See* Am. Compl., ¶¶ 37, 45; Daul Decl., Ex. F, Transaction Agreement, § 15.10; *id.*, Ex. G, Stock Restriction Agreement, § 11(b); *id.*, Ex. H, Covenants Agreement, § 6.3. This indicates that the parties had chosen Delaware law "as their common language of commerce" and that they understood "that litigation over later contractual differences could ensue in Delaware." *Hazout*, 134 A.3d at 279, 293 (fact that four of the relevant agreements contained Delaware choice of law and/or forum selection clauses supported finding that due process was satisfied).  The Individual Defendants could thus reasonably foresee being haled into court in Delaware to answer for actions taken in their official capacity regarding Dr. Pestell's employment relationship with the Company.   Moreover, as directors[16] of a Delaware corporation, they could reasonably expect to be haled into a Delaware court related to their deliberations concerning Dr. Pestell's employment with – and termination from – a corporation organized under, and governed by, Delaware law.

Individual Defendants also seek to support their jurisdictional arguments by pointing to the fact that Dr. Pestell's WPCL claim is governed by Pennsylvania, rather than Delaware, law.[17] Their position should be rejected because, even though the WPCL claim is brought under

---

[16]     As noted *supra*, Dr. Pourhassan is also an officer, *i.e.*, President and CEO.

[17]     The Employment Agreement provides that it shall be governed by and construed in accordance with Delaware law. *See* Am. Compl., Ex. A, Employment Agreement, § 5.6.  For this reason, Plaintiff's original Complaint asserted his wage payment claim under Delaware's Wage Payment & Collection Act. CytoDyn – joined by the Individual Defendants – moved to dismiss, arguing that the Delaware statute was inapplicable. *See* D.I. 11; D.I. 14.  In response, Plaintiff chose to amend his pleading to assert a claim under Pennsylvania's WPCL instead.

Pennsylvania law (due to Dr. Pestell's performance of duties in Pennsylvania, and per Section 2.5 of the Employment Agreement), the Individual Defendants' actions were taken on behalf of a Delaware corporation in violation of an Employment Agreement requiring a Delaware forum for the resolution of disputes.   The WPCL "establishes a statutory vehicle to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement. . . . "[T]he right to recover wages 'earned' by employees upon separation from employment under the WPCL is a statutory remedy which *supplements* . . . a common law action for breach of contract." *Andrews v. Cross Atl. Capital Partners, Inc.*, 158 A.3d 123, 133-34 (Pa. Super. 2017) *(emphasis in original)*.   Given that the Employment Agreement provides for a Delaware forum while also specifying that the "principal place of business" for Dr. Pestell's performance of his duties was in Pennsylvania,[18] it was entirely foreseeable that the Individual Defendants would be haled into court in Delaware to answer for violations of Pennsylvania employment law.

Further, the cases cited by the Individual Defendants are factually distinguishable.   In *Turf Nation, Inc. v. UBU Sports, Inc.*, 2017 WL 4535970, at *9 (Del. Super. Oct. 11, 2017), the court found that the defendant was a "necessary or proper party," but that the exercise of personal jurisdiction was not consistent with due process.   However, *Turf Nation* did not involve a Delaware forum selection or choice of law clause; instead, the relevant agreement called for the application of Georgia law. *Id.*   Similarly, *Wiggins v. Physiologic Assessments Servs., LLC*, 138 A.3d 1160, 1164 (Del. Super. 2016), which arose in the LLC context, involved a contract with a New Jersey choice of law provision.   Here, however, the Employment Agreement makes clear that the parties and their agents can expect litigation concerning Dr. Pestell's employment, or

---

[18]     *See* Daul Decl., Ex. E, Employment Agreement, § 2.5.

termination therefrom, to take place in Delaware.  *See* Daul Decl., Ex. E, Employment Agreement, § 5.6.

Finally, the fact that the Company's CFO, rather than one of the Individual Defendants, signed the Employment Agreement on behalf of the Company is not dispositive for purposes of the due process analysis.  The Individual Defendants were obviously aware of the existence and contents of the Employment Agreement, given that the July 1 Email from the CEO and the Termination Letter from the Chairman both reference the Employment Agreement.  *See* Daul Decl., Ex. I, July 1 Email; *id.*, Ex. J, Termination Letter.  The signature pages to both the Employment Agreement and the Transaction Agreement indicate that, although they were ultimately signed by the CFO, it was originally contemplated that Dr. Pourhassan would execute the documents on behalf of the Company.  *See* Am. Compl., ¶¶ 38, 53; Daul Decl., Ex. E, Employment Agreement (containing execution counterparts, one page of which includes blank for Dr. Pourhassan to sign); *id.*, Ex. F, Transaction Agreement (same).  The Amended Complaint further alleges that the CEO and the Chairman played an active role in decisions regarding Dr. Pestell's employment and his termination – indeed, it alleges that the CEO and the Chairman led the effort to diminish his role at the Company and ultimately fire him.  *See, e.g.*, Am. Compl., ¶¶ 78, 119-20, 125, 168-69, 172, 212; *see also* Daul Decl., Ex. E, Employment Agreement, § 2.2 ("The Executive shall report to, and be subject to the lawful direction of, the Board and the Chief Executive Officer of the Company.").  Given that, pursuant to the Employment Agreement, all actions relating to Dr. Pestell's employment or termination are to be brought in Delaware, and that the Individual Defendants were directors (and one also an officer) of a Delaware corporation, they had fair warning that their conduct could result in an action against them in this Court.  Individual Defendants' due process concerns are satisfied.

Because the Individual Defendants consented to jurisdiction in Delaware, purposefully availed themselves of the benefits and protections of Delaware law, and could foresee being sued in this forum for their conduct in connection with the termination of Dr. Pestell's employment, the Court's exercise of personal jurisdiction over them is consistent with constitutional requirements of due process.

## VI.   CONCLUSION

For the foregoing reasons, the Court may properly exercise personal jurisdiction over the Individuals Defendants.  The Individual Defendants' Motion should be denied.

Respectfully submitted,

Dated: November 8, 2019

/s/ Michael C. Hochman
Michael C. Hochman (DE No. 4265)
Monzack Mersky McLaughlin and Browder, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE 19801
Tel: (302) 656-8162
Fax: (302) 656-2769
mhochman@monlaw.com

-and-

Steven M. Coren (admitted pro hac vice)
Benjamin M. Mather (admitted pro hac vice)
Janice I. Daul (admitted pro hac vice)
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
bmather@kcr-law.com
jdaul@kcr-law.com
Counsel for Plaintiff
Richard G. Pestell, M.D., Ph.D